No. 73,125

STATE OF KANSAS, *Appellee,* v. MICHAEL C. MATSON, *Appellant.*

(921 P.2d 790)

Opinion filed July 12, 1996.

*Steven R. Zinn*, deputy appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellants.

*Debra S. Peterson*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Defendant was convicted by a jury of one count of first-degree premeditated murder and one count of second-degree murder. He was acquitted of alternate charges of first-degree felony murder and of additional charges of aggravated robbery and aggravated burglary. Defendant appeals his convictions and sentences, claiming the trial court erred in: (1) permitting the State to amend the complaint's charge of first-degree premeditated murder during trial, (2) failing to suppress portions of the defendant's statement to police, (3) refusing to permit the defendant to introduce into evidence the prior inconsistent statements of a witness, (4) admitting into evidence gruesome photographs, (5) failing to conduct an evidentiary hearing on the defendant's second motion for a new trial, and (6) denying the defendant's post-trial motion for an independent examination of the tape recordings of his statements to police. Additionally, the defendant raises the following issues pro se: (1) error in failing to instruct the jury on the defense of compulsion and (2) abuse of discretion in sentencing.

Defendant Mike C. Matson was charged with various crimes relating to the shooting deaths of Dale Pavey, who was described by Matson as a cocaine addict and a seller of drugs connected with

a group of Jamaican drug dealers, and Pavey's girlfriend Julie Voyles. Matson was arrested in Illinois and returned to Kansas to stand trial for the murders. Matson admitted to the police that he shot and killed Pavey and Voyles. Matson met Pavey through Pavey's daughter. Pavey eventually began selling cocaine to Matson. Shortly before he was killed, Pavey told his son that Matson owed him money for drugs Matson had purchased.

Matson related the following version to the police. Matson claimed Pavey had threatened to have him killed if Matson did not pay $500 or $600 by a certain date for cocaine he had purchased. The night before the debt was due, Matson, who had approximately $300, was unable to sleep. The next morning, because he had been threatened, Matson armed himself with a gun and drove to Pavey's. Matson knocked on the door. Voyles admitted him. Matson talked to Pavey. When Pavey informed Matson that he had better have the money, Matson said he had the money. As Pavey turned, Matson shot Pavey in the back of the head or neck. Pavey fell face down and then rolled over. Matson stated that after he shot Pavey, Voyles began firing at him with an SKS rifle. Matson shot at Voyles until his gun was out of bullets. He took the SKS rifle from Voyles and shot her. The shot nearly decapitated her. Matson again shot Pavey "to make sure" and so Pavey would not suffer. Matson said that he took Pavey's billfold, but did not take drugs.

The defendant gave a similar version of the shooting at trial but for the first time claimed to the jury he had shot Pavey in self-defense. Matson testified that there was a pistol on the floor and Pavey's hands were by or on the pistol. To defend himself, Matson shot Pavey. Matson testified that after he shot Pavey, he heard a gun blast and thought that he had been shot. Matson turned and fired in the direction of the blast. Voyles, who had shot at him, was wounded by his shots. He took the SKS rifle from Voyles, stepped back, and shot Voyles. Matson stated that he then turned and again shot Pavey.

The jury convicted Matson of first-degree premeditated murder in the death of Pavey and of second-degree murder in the death of Voyles. The jury acquitted the defendant of first-degree felony murder in the deaths of Pavey and Voyles and of aggravated rob-

bery and aggravated burglary. Matson was sentenced to consecutive terms of life with parole eligibility in 15 years and 15 years to life. Matson's trial counsel timely appealed the convictions. In addition to the brief filed by Matson's appellate counsel, Matson was allowed to file a pro se brief raising additional issues.

## FAILURE TO DISMISS COMPLAINT

The original complaint charged the defendant with the crimes of first-degree premeditated murder and, in the alternative, first-degree felony murder in the deaths of Dale Pavey and Julie Voyles.

At the time of these offenses, December 1992, first-degree premeditated murder was defined as "the killing of a human being committed maliciously, willfully, deliberately and with premeditation." K.S.A. 1992 Supp. 21-3401(b). Effective July 1, 1993, the statute was amended to define first-degree premeditated murder as "the killing of a human being committed . . . [i]ntentionally and with premeditation." K.S.A. 1993 Supp. 21-3401(a). Thus, in the 1993 version the elements of "maliciously" and "deliberately" were deleted.

Although the crimes charged occurred in December 1992, the State charged the defendant according to the statute which took effect July 1, 1993. The complaint originally charged the defendant with first-degree premeditated murder, stating: The defendant "did then and there unlawfully, willfully, kill a human being . . . intentionally and with premeditation by shooting . . . ." The complaint listed "Section 18(a), chapter 291, 1993 Session Laws of Kansas" as the statutory basis for the crime and specified that the crime was first-degree murder, an "Off-Grid, Person Felony." By using the 1993 version of the statute, the State omitted the requisite elements of "maliciously" and "deliberately" from the complaint.

The defendant did not challenge the first-degree premeditated murder charges for the failure to allege all the statutory elements of the crime until the instructions conference—after the close of the evidence but before the case was submitted to the jury. At that time the defendant moved for dismissal of the first-degree premeditated murder charges, arguing that the complaint was defec-

tive for failing to allege the statutory elements of "maliciously" and "deliberately." The State moved to amend the complaint to include the missing elements. The State argued that the amendment to the complaint was proper because the defendant had adequate notice of the charges and that amending the charge to include the missing elements would not materially affect the crime charged. The defendant objected, contending that it was too late to amend the charges and that the trial court was without jurisdiction to amend an invalid complaint. The judge granted the State's motion to amend the complaint to include "maliciously" and "deliberately." An amended complaint was filed.

The State's right to amend a complaint or information is statutory. K.S.A. 22-3201(e) states: "The court may permit a complaint or information to be amended at any time before verdict or finding if no additional or different crime is charged and if substantial rights of the defendant are not prejudiced." A two-part analysis determines whether an amendment prior to submission of the case to the jury may be permitted: (1) Does the amendment charge an additional or different crime? (2) Are the substantial rights of the defendant prejudiced by the amendment? See *State v. Starr*, 259 Kan. 713, Syl. ¶ 1, 915 P.2d 72 (1996); *State v. Barncord*, 240 Kan. 35, 38, 726 P.2d 1322 (1986).

## Additional or Different Crime

The defendant asserts that the amended complaint charged a new and different crime. He reasons that the complaint filed was jurisdictionally defective because the count charging first-degree premeditated murder failed to charge a crime; thus, the court had no jurisdiction to allow an amendment to the charging document. In support of this assertion, the defendant cites *State v. Wilson*, 240 Kan. 606, 731 P.2d 306 (1987).

*Wilson* involved a single-count information which charged that the defendant "did then and there unlawfully, wilfully kill and murder one Polly A. Stone." 240 Kan. at 606-07. The information failed to charge any degree of homicide or that the killing was done "maliciously, deliberately, and with premeditation." During trial, the prosecutor moved to amend the information to charge first-degree

premeditated murder. The trial court granted the motion to amend but the prosecutor failed to file an amended information or amend the original information by interlineation. The defendant was convicted of the lesser included offense of murder in the second degree. The defendant appealed, claiming the trial court had no jurisdiction to convict her because the information failed to charge a crime. On appeal, the *Wilson* court first observed that the information had never been amended as requested. The court noted that because the information failed to charge a crime, an amendment was necessary and if the information had been amended it would have charged an "additional or different crime." The *Wilson* court concluded that an information which does not charge any offense cannot be amended over defense objection to first charge any offense during trial. 240 Kan. at 608.

The defendant's reliance on *Wilson* is misplaced because the complaint here was not wholly defective. The complaint charged Matson with both first-degree premeditated murder and first-degree felony murder. Although the language in the complaint purporting to charge first-degree premeditated murder was not statutorily sufficient to charge that offense, the alternative charge of first-degree felony murder was not defective.

The State argues that because the charge of first-degree felony murder was statutorily sufficient, the trial court had jurisdiction under K.S.A. 22-3201(e) to allow an amendment to the charge of first-degree premeditated murder. The State points out that first-degree premeditated murder and first-degree felony murder are not separate and distinct crimes but are alternative theories of proving the same crime.

In the recent case of *State v. Starr*, 259 Kan. 713, this court addressed the issue Matson now raises. In *Starr*, the defendant was originally charged with first-degree premeditated murder and first-degree felony murder and other related offenses. Prior to trial, the State dismissed the charge of first-degree premeditated murder and proceeded to trial on the charge of first-degree felony murder. However, at the close of the State's case in chief, the judge, in overruling the defendant's objection, permitted the State to amend the complaint to reinstate the charge of first-degree premeditated

murder. Starr was convicted of first-degree premeditated murder and other crimes. Starr appealed the first-degree murder conviction, claiming the district court did not have jurisdiction to try him for first-degree premeditated murder because that charge had been dismissed prior to commencement of the trial. The *Starr* court first observed that premeditated murder and felony murder are not separate and distinct crimes but rather are two different theories under which the crime of first-degree murder may be committed. The *Starr* court concluded that amending a charge of first-degree felony murder to include a charge of first-degree premeditated murder during trial is not charging an additional or different crime.

The rationale of *Starr* controls. The judge had statutory authority to allow the amendment to the complaint. The amended complaint did not charge a new or additional crime or substantially prejudice the rights of the defendant by the amendment.

As an additional argument, the defendant asserts that under the particular facts of this case the charge of first-degree premeditated murder must be a separate and distinct crime from first-degree felony murder because prior to trial the State had sought to impose the hard 40 sentence if the defendant was convicted of first-degree premeditated murder. Matson reasons that because the hard 40 sentence is not available for first-degree felony murder convictions, the hard 40 sentence sought for the crime of first-degree premeditated murder makes it a separate and distinct crime from first-degree felony murder.

This reasoning is flawed. The availability of the hard 40 sentence for first-degree premeditated murder does not make that crime separate and distinct from first-degree felony murder for several reasons. First, the jury declined to impose the hard 40 sentence for the first-degree premeditated murder of Dale Pavey. Second, as to the murder of Julie Voyles, the jury did not consider the hard 40 sentence because the defendant was convicted of second-degree murder of Voyles, not first-degree murder. Finally, and most importantly, the hard 40 sentence is just that, a sentence—not a separate crime.

## FAILURE TO SUPPRESS

The defendant next claims that the trial court erred in failing to suppress a portion of his statement made to law enforcement officers during an interrogation in Illinois.

Twenty-three separate rights are noted in the first 8 Amendments to the United States Constitution, 12 of which concern criminal procedure. Violations of the Fourth, Fifth, and Sixth Amendment rights can result in suppression of evidence seized by law enforcement officers. The Fourth Amendment guarantees the right to be secure against unreasonable searches and seizures and prohibits the issuance of arrest warrants without probable cause. The Fifth Amendment prohibits placing a person in jeopardy by compelling the witness to be a witness against himself or herself. The Sixth Amendment lists several rights applicable to criminal prosecutions such as the right to counsel, the right to a speedy and fair trial, and the right to confront opposing witnesses. Fifth and Sixth Amendment rights are most frequently an issue in determining whether statements made by a defendant to law enforcement officers are admissible at the defendant's trial.

The rules concerning custodial interrogation and the exercise of a constitutional right are well established. A suspect in custody must be advised that he or she has the right to remain silent and the right to the presence of counsel before the suspect may be interrogated. *Miranda v. Arizona*, 384 U.S. 436, 479, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). If the accused asks for counsel, the interrogation must cease until counsel is present. *Miranda*, 384 U.S. at 474; see *Edwards v. Arizona*, 451 U.S. 477, 481-82, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981).

"[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. . . . [A]n accused . . . having expressed his desire to deal with police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484-85.

The same rules apply where the right to remain silent is exercised. In determining whether events subsequent to the exercise of a constitutional right constitute a waiver of the previously asserted right, the court must first determine whether the accused actually invoked the right and, if so, the court must then determine whether the accused (a) initiated further discussions with the police and (b) knowingly and intelligently waived the previously asserted right. *Smith v. Illinois*, 469 U.S. 91, 95, 83 L. Ed. 2d 488, 105 S. Ct. 490 (1984). Waiver of the right must be knowing, voluntary, and intelligent under the totality of the circumstances. See *Oregon v. Bradshaw*, 462 U.S. 1039, 1046, 77 L. Ed. 2d 405, 103 S. Ct. 2830 (1982).

After his arrest in Illinois for these offenses and receiving the warning required under *Miranda*, Matson waived his Fifth and Sixth Amendment rights and agreed to talk with Sedgwick County law officers. The defendant admitted going to Pavey's residence and the circumstances of the shooting of Pavey and Voyles. Matson was asked what he did after leaving Pavey's residence, and he stated that he ran into a friend, Ty Gerberding. When asked if he had told Gerberding what happened, Matson stated, "I won't answer no more questions at all as far as that goes from there on out, as far as what happened after that, I've admitted to what happened and there will be no more answering on that part." Questioning continued concerning what Matson did with the pistol he used and other matters. The defendant answered those questions. A short time later, there was a break in questioning for a cigarette or water. After the tape-recorded interview resumed, Matson related that during the break he informed the officers that he had told Gerberding he had killed Pavey and Voyles. The defendant also admitted that he had told others that he had killed Pavey and Voyles.

Prior to trial, the defendant sought to suppress his statement to law enforcement officers. Sedgwick County Sheriff's Deputy Kravitz testified that the defendant waived his *Miranda* rights, agreed to give a statement, and did not appear to be under the influence of alcohol or other drugs. Kravitz admitted that the defendant indicated he did not want to talk about Ty Gerberding but that after a discussion with Detective Hodge the defendant decided to talk

about what he told Gerberding. Detective Hodge testified that the defendant indicated he did not want to talk about Gerberding. Hodge stated that the defendant agreed to continue answering questions, but not about Gerberding. Hodge described what happened during the break when the defendant agreed to talk about what he told Gerberding.

The defendant's attorney argued that coercion occurred during the break after the defendant said he did not want to answer any more questions "as far as what happened after that." Defense counsel asked that the entire interview be suppressed because the defendant was intoxicated when he was arrested and that "any points after when he asked not to speak any more that those points be suppressed." The trial judge found that (1) defendant knowingly and voluntarily waived his rights and (2) the defendant's statements that he would not answer questions were not indicative of a desire to terminate the interview by the officers. On appeal, the defendant argues that the trial judge should have suppressed the portion of his statement regarding his discussion of the shooting incident with Ty Gerberding.

In *Michigan v. Mosley*, 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321 (1975), the United States Supreme Court interpreted *Miranda* to require cessation of interrogation once an accused has invoked a *Miranda* right. The *Mosley* court stated that an interrogator must "scrupulously honor" the exercise of those rights once asserted. 423 U.S. at 104.

In evaluating the voluntariness of a confession, an appellate court must decide whether the State has adequately proved (1) that the accused knowingly and intelligently waived his or her constitutional right; (2) that interrogation ceased for an appreciable period when the accused exercised a constitutional right; and (3) that the statements made by the police after the exercise of the right did not amount to questioning, its functional equivalent, or statements known to be likely to produce an incriminating response. *State v. Newfield*, 229 Kan. 347, 355, 623 P.2d 1349 (1981).

In reviewing admission into evidence of custodial statements, the first question for an appellate court to determine is whether there is substantial evidence to support the district judge's finding

that the confession was voluntary. In determining whether a confession is voluntary, a court is to look at the totality of the circumstances. The burden of proving that a confession or admission is admissible is on the prosecution, and the required proof is by a preponderance of the evidence. Factors bearing on the voluntariness of a statement by an accused include the duration and manner of the interrogation; the ability of the accused on request to communicate with the outside world; the accused's age, intellect, and background; and the fairness of the officers in conducting the interrogation. The essential inquiry in determining the voluntariness of a statement is whether the statement was the product of the free and independent will of the accused. *State v. Price*, 247 Kan. 100, Syl. ¶ 1, 795 P.2d 57 (1990). When a trial court conducts a full hearing on the admissibility of an extrajudicial statement by an accused, determines the statement was freely and voluntarily given, and admits the statement into evidence at trial, an appellate court accepts that determination if it is supported by substantial competent evidence. *State v. Morris*, 255 Kan. 964, 971, 880 P.2d 1244 (1994); see also *State v. Garcia*, 250 Kan. 310, Syl. ¶ 2, 827 P.2d 727 (1992) ("If the findings of the trial court on a motion to suppress evidence are based upon substantial evidence this court on review will not substitute its view of the evidence for that of the trial court.").

Here, the defendant did not invoke his right to remain silent. He indicated that he would not answer questions about Ty Gerberding, but did not express a desire to terminate questioning altogether. In addition, when Hodge understood that the defendant would not talk about Gerberding, Hodge moved back to the original line of questioning. The defendant did not decline to answer questions as to what happened but only refused to answer questions that would involve his friends. During the break Hodge did not threaten the defendant or make promises to him to induce him to answer questions as to Gerberding. Hodge only asked the defendant to be honest and may have informed the defendant that he had already spoken with Gerberding. Hodge's actions did not amount to questioning or its functional equivalent.

There was substantial competent evidence upon which the trial court could find that the defendant's willingness to relate what he told Gerberding was based on the defendant's own free will and not on coercion. The defendant voluntarily answered questions about Gerberding. His Fifth Amendment rights were not violated.

## PRIOR INCONSISTENT STATEMENTS

The defendant next claims that the judge erred in refusing to admit evidence of prior inconsistent statements made by Melva Lee Bishop, the ex-wife of Dale Pavey, a defense witness. The defense called Bishop believing she would testify that Pavey had previously threatened to do violence to other people. When asked Pavey's reputation for threatening or being violent, Bishop testified that she was never afraid of Pavey and had never observed Pavey threatening anyone. In an effort to lay a foundation for the admission of the witnesses' prior statements, the defendant's counsel proffered to the court that the police officer would testify that Bishop stated that on two separate occasions she heard Pavey say that he would kill certain people. The trial judge denied the defendant's request to impeach Bishop through the police officer because that testimony would violate the limitation for admitting specific incidents of conduct.

K.S.A. 60-446 states that "[w]hen a person's character or a trait of his or her character is in issue, it may be proved by testimony in the form of opinion, evidence of reputation, or evidence of specific instances of the person's conduct, subject, however, to the limitations of K.S.A. 60-447 and 60-448." The limitation in K.S.A. 60-447 states that "when a trait of a person's character is relevant as tending to prove conduct on a specified occasion, such trait may be proved in the same manner as provided by K.S.A. 60-446, except that . . . evidence of specific instances of conduct other than evidence of conviction of a crime which tends to prove the trait to be bad shall be inadmissible." The defendant contends he should have been permitted to question Bishop about her prior inconsistent statements to impeach her pursuant to K.S.A. 60-420, even though the impeaching testimony would refer to specific instances

of conduct of the victim and would generally be prohibited by K.S.A. 60-447.

We disagree with the trial judge's analysis and conclusion that the statutory prohibition precluded the admission of the witness' prior statement. Bishop's responses were contrary to prior statements she made to a police officer that Pavey had threatened to kill certain people. K.S.A. 60-420 states that "for the purpose of impairing or supporting the credibility of a witness, any party including the party calling the witness may examine the witness and introduce extrinsic evidence concerning any conduct by him or her and any other matter relevant upon the issues of credibility."

In *State v. Macomber*, 241 Kan. 154, 158-59, 734 P.2d 1148 (1987), this court held that evidence the witness had used marijuana before testifying at the preliminary hearing that he was not under the influence of drugs was admissible to impeach the witness' testimony at trial that he had never lied on the witness stand, even though the evidence related to specific instances of conduct which would be otherwise inadmissible. In *State v. Nixon*, 223 Kan. 788, 790-94, 576 P.2d 691 (1978), evidence that the witness had sold drugs was admissible to impeach her testimony that she had never sold drugs. In *State v. Beans*, 247 Kan. 343, 346-48, 800 P.2d 145 (1990), evidence concerning the complainant's prior conviction and probation for prostitution was admissible to impeach her testimony concerning that probation.

The defendant also cites *State v. Barber*, 13 Kan. App. 2d 224, 766 P.2d 1288, *rev. denied* 244 Kan. 739 (1989). There, the court found that the trial court properly excluded evidence that the victim of an alleged crime of indecent liberties with a child had previously made allegedly false accusations of sexual abuse. The court stated: "[U]nder certain circumstances, the limitation of 60-422 [prohibiting the admissibility of specific instances of conduct to impeach a witness' credibility] must bend to a defendant's right of cross-examination." 13 Kan. App. 2d at 226. However, the court found that an exception to the limitation of K.S.A. 60-422 was applicable in that case only upon the threshold determination that the prior allegations of abuse were false. 13 Kan. App. 2d at 227. Because the trial court found there was no indication the com-

plaining witness' prior allegations of abuse were false, the trial court did not abuse its discretion in excluding the evidence.

Even though the judge erred in excluding the prior inconsistent statements, here, there was ample evidence before the jury concerning Dale Pavey's tendency for violence. His son testified that Pavey had a reputation for being a tough guy and that he got aggressive and angry at times. Another witness testified about Pavey's reputation for violence. She stated that if somebody owed Pavey money, he would send certain people after them to collect money and that he could be persuasive at times when he wanted to get a point across. The witness also testified that although she had never seen Pavey have anyone killed, Pavey had stated that if anyone ever needed anyone "done in" to call him. In light of this other evidence, the exclusion of evidence concerning statements Bishop made to the police did not affirmatively cause prejudice to the substantial rights of the defendant and does not require reversal. See *State v. Johnson*, 255 Kan. 140, 148, 871 P.2d 1246 (1994). Even though the trial court's exclusion of the evidence was error, it was harmless error.

## REPETITIOUS GRUESOME PHOTOGRAPHS AND VIDEOTAPE

The defendant also argues that the trial court erred in admitting into evidence gruesome photographs and photographs and a videotape of the scene. The admission of photographs in a homicide case is a matter that lies within the discretion of the trial court, and the trial court's ruling will not be disturbed on appeal absent an abuse of that discretion. Photographs which are unduly repetitious, gruesome, and without probative value should not be admitted into evidence. However, demonstrative photographs are not inadmissible merely because they are gruesome and shocking where they are true reproductions of relevant physical facts and material conditions at issue. *State v. Stone*, 253 Kan. 105, 111, 853 P.2d 662 (1993); *State v. Mayberry*, 248 Kan. 369, Syl. ¶ 12, 807 P.2d 86 (1991).

We have reviewed the photographs and the videotapes of the crime scene and autopsy. They are gruesome and shocking because

they are true reproductions of relevant physical facts. However, we do not find that the admissions of the photographs and the video-tapes in this case rise to a level of an abuse of discretion.

## EVIDENTIARY HEARING

In his second motion for a new trial the defendant raised two claims of newly discovered evidence: (1) Some witnesses were under the influence of alcohol and/or drugs at the time of their testimony, and (2) witnesses were intimidated by the prosecutor. The trial court held a nonevidentiary hearing on the motion and denied the defendant a new trial. The defendant claims the trial court erred in failing to conduct an evidentiary hearing.

Determining whether a new trial is warranted based on newly discovered evidence involves a two-part test: (1) The defendant bears the burden of proving that the evidence is in fact "new" and could not with reasonable diligence have been produced at trial, and (2) the evidence must be of such materiality that there is a reasonable probability it would produce a different result upon retrial. *State v. Thomas*, 257 Kan. 228, 231, 891 P.2d 417 (1995).

### Witness' Drug Use

This court has stated that "[f]or purposes of discrediting a witness, drug-use evidence is admissible to the extent it shows the witness was under the influence of drugs at the time of the occurrence as to which the witness testifies or at the time of trial. It is also admissible to the extent that it shows the witness' mind, memory, or powers of observation were affected by the habit." *State v. Osby*, 246 Kan. 621, Syl. ¶ 2, 793 P.2d 243 (1990). Thus, evidence that Gerberding was under the influence of drugs at the time of his testimony could be relevant at trial.

As to the claim that one of the witnesses was under the influence of drugs when testifying, counsel argued that Gerberding's testimony was crucial and that if he was on drugs it would affect his credibility. The defendant's counsel stated to the judge that the defendant

"indicated to me that some of the witnesses and friends of his that testified in this trial have communicated with him while he's been incarcerated after his sentenc-

ing; and they've indicated to him that some of the witnesses or one may have been under the influence of drugs when they testified . . . ."

". . . What he indicated to me is this: That Jay Hancock, who was a witness in this case, indicated that Jay talked to Ty Gerberding after he testified. . . . Mr. Hancock indicated Ty Gerberding said to him that Kim Parker, quote, bitched him out right before he testified because she thought he was stoned or under the influence of some drug. She put him on the stand anyway. Now, I talked to Jay Hancock; and Jay Hancock indicated, Yes, Ty Gerberding did tell me that."

First, we note that Gerberding did not say he was "stoned" when he testified, he repeated what the prosecutor said to him. In addition, the prosecutor stated that Gerberding appeared to have a very red face on the morning before he testified when she inquired if he was under the influence of alcohol or drugs. Gerberding insisted to the prosecutor that he was not under the influence of drugs or alcohol. The prosecutor informed the court that she was satisfied there was nothing in Gerberding's speech or behavior to suggest intoxication. Gerberding testified that afternoon. The court ruled that the prosecutor's questions were to insure that the witness was competent to testify. In addition, the defendant and his counsel had observed Gerberding at trial. Gerberding's mannerisms at trial did not indicate that he was under the influence of alcohol or drugs. The defendant's counsel made no proffer that Gerberding would state that he was in fact under the influence of alcohol or drugs when testifying.

The claim raised by the defendant is speculative. There was no need for an evidentiary hearing to determine whether Gerberding had been under the influence of drugs. The trial court did not err in refusing to conduct an evidentiary hearing on this issue. See *State v. Dunn*, 243 Kan. 414, 436, 758 P.2d 718 (1988) (court conducted initial hearing on motion for new trial to determine whether the claims asserted in the motion were substantial before granting a full evidentiary hearing and requiring the defendant's presence); *State v. Bryant*, 227 Kan. 385, 391, 607 P.2d 66 (1980) (no abuse of discretion in failing to hold an evidentiary hearing on a motion for a new trial because the court conducted a preliminary inquiry to determine whether the claims asserted in the motion were substantial);

## Prosecutor Threatening Witnesses

The defendant's counsel informed the court that the defendant stated that some of the witnesses and friends had indicated to him that they had felt threatened by the prosecution attorneys to testify in a certain manner. Counsel stated:

"Shane Armour has communicated with Mike, and I've not talked to Shane, that he felt threatened by Kim Parker and . . . she said that she had taped conversations of he and Mr. Matson, and if he testified any differently from what his statements were previously, she'd file some kind of conspiracy charges against him. Also, after trial Shane indicated that he had some notice that some pending charges against him had been dropped after he testified.

"Nate Wiens, another witness, indicated that Kim Parker threatened him that if he testified for the defendant, whatever that meant, she would bring charges against him.

"Mike indicates to me by letter that Shane and Nate were both intimidated, but after seeing what Mike got for his sentence, they were . . . prepared to come forward at this time . . . ."

In response, the prosecutor stated that she had conversations with Amour and Wiens a week or two prior to trial and had informed Amour she was aware that he had been visiting the defendant in jail. She stated that there was no taped conversation between Wiens and the defendant and she was unaware where that idea originated. The prosecutor did inform the witness that she had a taped conversation of what he had said to the officers earlier and that deviations from that taped statement could be harmful to his credibility. As to Wiens, the prosecutor also asked him if there were any material deviations from his taped statement but did not discuss his testimony. She informed him that material deviations from that taped statement could affect his credibility. The prosecutor denied threatening the witness with prosecution. The court found the prosecutor was doing her job and was doing nothing inappropriate.

The prosecutor adequately explained her conversations with both prospective witnesses. Neither Amour or Wiens testified at trial. Further, if the possibility that the prosecutor threatened Amour and Wiens is considered to be newly discovered evidence, that evidence must be of such materiality that there is a reasonable

probability it would produce a different result upon retrial. See *State v. Thomas*, 257 Kan. at 231. The flaw in the defendant's presentation of this issue is that he has not proffered what portion of Amour's and Wiens' testimony would have been different or how they had been threatened by the prosecutor. Without such a proffer, this court cannot say that there is a reasonable probability of a different result at trial. There was no need for an evidentiary hearing to determine whether the prosecutor had threatened Amour and Wiens.

## EXAMINATION OF TAPE

At the initial hearing for a new trial, the defendant's trial counsel asserted that an independent examination of the tape recordings of the defendant's statements to law enforcement officers was necessary because the defendant, upon reflection, believed that the tapes had been altered. The judge denied the motion.

On appeal the defendant argues that the trial judge abused his discretion in disallowing the tape analysis. For authority, the defendant cites *Mebane v. State*, 21 Kan. App. 2d 533, 902 P.2d 494 (1995). In *Mebane*, the defendant sought post-trial DNA testing of a rape kit. The *Mebane* court treated the request as a motion for a new trial based on newly discovered evidence. According to Matson, the underlying premise of *Mebane* is that post-trial testing of evidence may be appropriate if the evidence is highly exculpatory. Matson asserts that his taped statements were the most significant aspect of the State's case in terms of establishing premeditation and intent. He asserts that if the tapes were altered to eliminate statements that supported his claim of self-defense, the analysis would be exculpatory.

The defendant does not take his analysis of *Mebane* far enough. The *Mebane* court concluded that a defendant is not entitled to post-conviction DNA testing of evidence as a matter of absolute right and the motion "should not be granted unless the trial court determines, after a hearing, that the result of the testing would be potentially exculpatory." 21 Kan. App. 2d 533, Syl. ¶¶ 2, 3.

At the hearing on the defendant's request for a tape analysis, defense counsel was unable to articulate what had been altered on

the tapes. Although counsel indicated the defendant's father believed the tapes had changed between the preliminary hearing and the trial, the trial judge, who had presided at both, noted no changes nor discrepancy between the tapes and the transcript of the tapes. It is not clear whether the defendant contends the tapes were altered prior to the preliminary hearing or sometime between the preliminary hearing and trial. Further, although the defendant's trial counsel did not represent the defendant at the preliminary examination, the defendant was present at both hearings and when his statement was recorded, would have been aware of any discrepancies in the tapes.

The defendant has not shown the tapes were altered, what was removed would have been exculpatory, or that there was a likelihood that the evidence would change the result of the trial. The trial court did not abuse its discretion in refusing to permit the post-trial tape analysis.

## PRO SE ISSUES

### INSTRUCTION RE COMPULSION

In his pro se brief, the defendant claims the trial judge should have instructed the jury on the defense of compulsion because of threats against his family. The trial judge refused to give the instruction because there was no evidence to support the defense and found from the evidence the defense was one of self-defense rather than compulsion. The jury was instructed on self-defense.

K.S.A. 21-3209 sets forth the defense of compulsion:

"(1) A person is not guilty of a crime other than murder or voluntary manslaughter by reason of conduct which he performs under the compulsion or threat of the imminent infliction of death or great bodily harm, if he reasonably believes that death or great bodily harm will be inflicted upon him or upon his spouse, parent, child, brother or sister if he does not perform such conduct.

"(2) The defense provided by this section is not available to one who willfully or wantonly places himself in a situation in which it is probable that he will be subjected to compulsion or threat."

A trial judge is required to instruct the jury on the law applicable to the defendant's theories of defense if there is evidence supporting the theories, even if the evidence is slight and supported

only by the defendant's own testimony. *State v. Shortey*, 256 Kan. 166, 172, 884 P.2d 426 (1994). An appellate court's review of the trial judge's refusal to give a specific instruction must consider the evidence in the light most favorable to the party requesting the instruction. *State v. Scott*, 250 Kan. 350, Syl. ¶ 4, 827 P.2d 733 (1992).

This court has recognized that to constitute the defense of compulsion, coercion or duress must be present, imminent, impending, and continuous. It must be of such a nature as to induce a well-grounded apprehension of death or serious bodily injury to oneself or one's family if the act is not done. The doctrine of compulsion cannot be invoked as an excuse by one who had a reasonable opportunity to escape the compulsion or avoid doing the act without undue exposure to death or serious bodily harm. A threat of future injury is not enough. See *State v. Davis*, 256 Kan. 1, Syl. ¶ 3, 883 P.2d 735 (1994); *State v. Crawford*, 253 Kan. 629, 635, 641, 861 P.2d 791 (1993); *State v. Hunter*, 241 Kan. 629, Syl. ¶ 10, 740 P.2d 559 (1987). Under the facts the defendant was not entitled to an instruction on the defense of compulsion because he was acquitted of all crimes except first-degree premeditated murder and second-degree murder. Compulsion is not an available statutory defense to the crimes. See K.S.A. 21-3209.

## ABUSE OF DISCRETION IN SENTENCING

The defendant also claims in his pro se brief that the trial court abused its discretion in imposing the maximum sentence for the second-degree murder conviction and in making that sentence consecutive to the first-degree murder sentence.

The defendant contends that the trial judge failed to take into consideration any of the circumstances surrounding the unfortunate deaths of Pavey and Voyles, including the death threats made to the defendant by Pavey. A review of the record shows that the judge carefully detailed his analysis of the requisite factors in imposing the sentences. The sentences were not an abuse of discretion.

Affirmed.