No. 75,020

STATE OF KANSAS, *Appellee*, v. OLANDER J. HICKLES III,
*Appellant*.

929 P.2d 141

Opinion filed December 6, 1996.

*Wendy L. Rhyne Slayton*, special appellate defender, argued the cause, and *Steven R. Zinn*, deputy appellate defender, was with her on the brief for appellant.

*Robert Forer*, county attorney, argued the cause, and *Carla J. Stovall*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Defendant Olander Hickles III appeals his conviction of one count of first-degree murder, K.S.A. 21-3401, and his sentence of life without possibility of parole for 40 years (hard 40), claiming the trial court erred by (1) admitting defendant's statement to police, (2) failing to instruct on the lesser included offenses of unintentional second-degree murder and reckless involuntary manslaughter, (3) admitting an excessive number of gruesome photographs and allowing the jury to visit the crime scene, and (4) imposing a hard 40 sentence.

Olander Hickles was originally charged with second-degree murder in the August 24, 1994, stabbing death of Earl Whetstone. At the conclusion of the preliminary examination, the complaint was amended to charge premeditated first-degree murder.

At the time of the incident, the victim and his wife, Christine, were separated. Christine had been spending time with a friend, Sharon Patton, and the defendant, Patton's live-in boyfriend. On the day of the incident, Christine told the defendant that her husband had broken her windows, cut her electrical line, and driven a car onto her porch. Later that day, Whetstone came to Patton's house and damaged some windows and a bicycle. When Hickles learned of the damage, he stated he was going to look for Whetstone. Scott, Patton's son, testified that Hickles said, "I'm going to twist the little peckerwood's head off, . . . [a]nd in the mood I'm

in . . . he just might lose his life too." Scott testified further that Hickles stated, "I won't just take [Whetstone's] money. In the mood I'm in, I might just take his life too."

Christine, Patton, and Hickles went to the home of Paco Martinez to look for Whetstone. When Whetstone appeared at the Martinez home, Christine confronted Whetstone about the damage to her property. Whetstone asked Christine what she was doing "fucking niggers now" and then asked Hickles what he was doing "fucking with [his] wife." Hickles answered, "White boy, you better have some money in your pocket or I'm going to kill you."

A fight ensued between Whetstone and Hickles first inside and then outside the house. Jesse Martinez testified that both combatants were calling each other names. Christine went outside 10 to 20 minutes later and found her husband lying in a pool of blood. She observed Hickles kick the wounded victim in the chest several times. Prior to leaving, Hickles returned to where Whetstone lay, lifted his head, and kicked him in the face.

Patton testified that when the victim arrived at the Martinez home, he confronted Christine and asked what she was doing "messing around with niggers." She testified that after Whetstone and Hickles began fighting inside the house, Martinez told the men to "take it outside." Patton opened the door and shoved the men out. When she looked outside later, she could see that Hickles had his knife drawn. She stated that Whetstone had no weapon. Patton observed Hickles stab Whetstone once in the rib area and saw blood on the knife. She went outside and saw the defendant stab Whetstone several more times. After the stabbing, she observed Hickles kick Whetstone's chest and head.

The autopsy revealed at least 11 different wounds to Whetstone's body. The forensic pathologist testified that he found eight stab wounds to the body, three cuts and blunt trauma injuries to the facial area, and a fractured larynx consistent with kicking. The pathologist stated that there could have been 13 different wounds. The pathologist testified that there were no defensive wounds to the victim's body, which indicated that the victim was not attempting to fend off the attacker.

Hickles did not testify at trial. His self-defense theory was based primarily upon a statement he made to the arresting officer. In his closing argument, defense counsel, relying on the officer's testimony regarding Hickles' statement, observed:

"Mr. Hickles told Agent Williams the knife fell and they struggled for it. I'm not sure if that's exactly what he told Agent Williams. According to Agent Williams' testimony, the defendant said when they were fighting, the knife fell from his waistband onto the ground, both he and Earl fought for the knife and Earl got stabbed."

The jury convicted Hickles of first-degree premeditated murder. Hickles was given a hard 40 sentence. Hickles appeals the conviction and sentence, raising four issues.

## ADMISSIBILITY OF STATEMENT

*Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), established that statements made by a suspect in custody are not admissible as evidence unless the suspect is informed that he or she has the right to remain silent and the right to counsel before the suspect may be interrogated. 384 U.S. at 479. *Miranda* held that when a defendant indicates "in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." 384 U.S. at 473-74. A suspect may, by conduct or specific words, waive a previously invoked right to remain silent.

Hickles was taken into custody while walking along a country road and transported to the Labette County jail in a deputy's patrol car. While en route to the police station, Hickles was advised of his *Miranda* rights. After arrival at the station, he was placed in a detective's office. Three law enforcement officers were present. Hickles was asked if he recalled being advised of his *Miranda* rights and if he recalled those rights. He responded that he understood and had no questions as to the *Miranda* rights.

Agent Williams then began to interview Hickles regarding the events surrounding Whetstone's death. Agent Williams told the defendant he wanted to hear Hickles' side of the story. Williams then proceeded to ask Hickles three or four questions about the

incident. In response to each question, Hickles stated, "I don't have anything to say."

Hickles then asked Agent Williams questions such as whether the agents had open minds and whether it would benefit him to tell his side of the story. Williams responded that the officers had open minds. Williams testified that during the interview, Hickles spent more time asking questions than Williams. After a few minutes, Hickles asked the officers, "Is this when I get an attorney?" Agent Williams testified that since he felt this question was ambiguous, he decided to clarify matters by asking, "Are you asking for an attorney?" When Hickles failed to respond, Agent Williams repeated the question. Hickles then responded that he was not requesting an attorney. At that point, approximately 5 to 7 minutes had passed since the questioning of Hickles had commenced.

Hickles then asked the agent additional questions, such as why his girlfriend had been arrested. He then asked if officers were aware of a broken window at his residence and asked, "Isn't that breaking and entering?" Agent Williams informed Hickles that the police were aware of the broken window and then asked Hickles additional questions about that incident.

The conversation then returned to the death of Whetstone. Hickles explained to the officers that he, Patton, and Christine had gone to the Martinez home looking for Whetstone. He stated Whetstone showed up later threatening everyone and after Whetstone asked Christine what she was doing "fucking around with niggers," he and Whetstone went outside and "[i]t just happened." Agent Williams then asked additional questions. Hickles responded that after his knife had fallen to the ground during the fight, he and Whetstone struggled for the knife and somehow Whetstone was stabbed. Agent Williams then summarized the conversation with Hickles and concluded the interview. The entire interview lasted from 15 to 30 minutes.

The defendant did not file a motion to suppress his statements. During the trial, the State requested a *Jackson v. Denno*, 378 U.S. 368, 12 L. Ed. 2d 908, 84 S. Ct. 1774 (1964), hearing to determine the voluntariness of the defendant's confession. At the hearing, Hickles argued that his statement to police that "I don't have any-

thing to say" was an unequivocal invocation of his Fifth Amendment right to silence. He contended that all questioning by the officers should have ceased at that point. Hickles asserted, in the alternative, that because his statement to the officers was ambiguous, the officers were required to ask clarifying questions to determine whether his statement was an attempt to invoke his Fifth Amendment right to silence.

The State's position at the *Jackson v. Denno* hearing was that Hickles had waived his right to remain silent and his statement, "I don't have anything to say," was a response to specific questions asked by the officer rather than an invocation of Hickles' Fifth Amendment right to remain silent.

The trial judge commented:

"The fairness of the officers in conducting the interrogation—I don't believe there's anything being demonstrated [that] they did anything underhanded or deceptive. The statements that he made would seem to be somewhat equivocal. When you say, 'I have nothing to say,' that might mean—that might mean he has nothing to say in response to a question. It doesn't necessarily mean that he has nothing to say for the rest of the day about the subject. When he stated that he wanted—'Is this when I get a lawyer?' that's somewhat ambiguous in and of itself, and the officer, I believe, had to not only—this case doesn't say that he had an obligation to ask a clarifying question. He says it's the better police practice to do so, and in this case, as a matter of fact, he did ask Mr. Hickles a clarifying question as to whether or not his statement meant that he wanted an attorney at that point in time, and it has been stated here on the record subsequently Mr. Hickles indicated he did not. So I can't find anything in this fact situation to indicate that the statements made by the defendant are anything but voluntary and would find them admissible based on that."

The trial judge ruled that Hickles' statement was voluntary and admissible.

In determining whether an accused's confession is voluntary, a court is to look at the totality of the circumstances. The burden of proving that a confession or admission is admissible is on the prosecution, and the required proof is by a preponderance of the evidence. Factors bearing on the voluntariness of a statement by an accused include the duration and manner of the interrogation; the ability of the accused on request to communicate with the outside world; the accused's age, intellect, and background; and the fair-

ness of the officers in conducting the interrogation. The essential inquiry in determining the voluntariness of a statement is whether the statement was the product of the free and independent will of the accused. *State v. Morris*, 255 Kan. 964, Syl. ¶ 1, 880 P.2d 1244 (1994).

On appeal, Hickles does not contend that his statement was an invocation of his Sixth Amendment right to counsel. Hickles claims that his response, "I have nothing to say," in answer to Agent Williams' initial questions constituted an affirmative assertion of his Fifth Amendment right to remain silent and was an invocation of that right which required a complete cessation of questioning by the agents. Defendant argues that the continued questioning by the agents after he invoked his right to remain silent vitiated the voluntariness of the statement. In other words, Hickles argues that he did not knowingly and voluntarily waive his *Miranda* rights.

The State asserts that the defendant's statement was merely an answer to a specific question, and neither an invocation of Hickles' Fifth Amendment right to silence nor an ambiguous and equivocal assertion of the right to remain silent. The State alleges that the admissibility of the statement is controlled by *Davis v. United States*, 512 U.S. 452, 129 L. Ed. 2d 362, 114 S. Ct. 2350 (1994), followed by this court in *State v. Morris*, 255 Kan. 964. In *Davis*, the United States Supreme Court held that if an accused's reference to a *Miranda* right is ambiguous or equivocal to a reasonable officer in light of the circumstances, the officer is not required to ask clarifying questions or cease questioning and may continue questioning until the suspect clearly invokes a right. 129 L. Ed. 2d at 373.

Hickles asserts that *Davis* and its progeny apply only when an accused has made an ambiguous invocation of his or her *Miranda* rights after a knowing and voluntary waiver. Hickles argues that because he had not waived his *Miranda* rights, the officers were required to cease questioning when he stated, "I have nothing to say," and clarify his willingness to talk before proceeding further. For authority, Hickles relies on *State v. Leyva*, 906 P.2d 894 (Utah App. 1995). In *Leyva*, the Utah Court of Appeals reversed the trial court's denial of defendant's motion to suppress his statement

given to police after he was pulled over for a traffic stop. After the trooper had informed Leyva of his *Miranda* rights, the trooper asked Leyva if he understood the rights. Leyva responded that he did. The trooper then asked Leyva, "Having these rights in mind do you wish to talk to us now?" Leyva answered, "I don't know." The trooper stated, "You don't have to answer questions if you don't want to. It is up to you." Leyva nodded his head affirmatively. The trooper then asked, "So why did you run?" Leyva gave an incriminating response to the trooper.

On appeal, Leyva argued the statement should have been suppressed because his equivocal invocation of his Fifth Amendment right to silence obligated the trooper to clarify his intention before asking further questions. The State argued that under *Davis v. United States*, 512 U.S. 452, the trooper was not required to cease questioning unless Leyva had clearly asserted his *Miranda* rights. The Utah court agreed with Leyva, holding that *Davis* applied only to situations in which a suspect has ambiguously reasserted a *Miranda* right after a knowing and voluntary waiver. Because Leyva's initial waiver of *Miranda* rights was ambiguous, the Utah court held the arresting officer was required to clarify Leyva's intention to talk before proceeding further with the interrogation. 906 P.2d at 900-01. Significantly, for purposes of this case, *Leyva* did not involve questioning initiated by the suspect.

As this court noted in *State v. Matson*, 260 Kan. 366, 373, 921 P.2d 790 (1996) (quoting *Edwards v. Arizona*, 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880 [1981]):

" '[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights . . . . [A]n accused . . . having expressed his desire to deal with police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police. *Edwards*, 451 U.S. at 484-85.' "

This court stated further in *Matson:*

"The same rules apply where the right to remain silent is exercised. In determining whether events subsequent to the exercise of a constitutional right con-

stitute a waiver of the previously asserted right, the court must first determine whether the accused actually invoked the right and, if so, the court must then determine whether the accused (a) initiated further discussions with the police and (b) knowingly and intelligently waived the previously asserted right. *Smith v. Illinois*, 469 U.S. 91, 95, 83 L. Ed. 2d 488, 105 S. Ct. 490 (1984). Waiver of the right must be knowing, voluntary, and intelligent under the totality of the circumstances. *See Oregon v. Bradshaw*, 462 U.S. 1039, 1046, 77 L. Ed. 2d 405, 103 S. Ct. 2830 (1982)." 260 Kan. at 374.

In *State v. Strayer*, 242 Kan. 618, 625, 750 P.2d 390 (1988), we held that an accused may waive *Miranda* rights by his or her own acts and words in initiating conversation with police. In that case, after Strayer was placed under arrest and read his *Miranda* rights, he stated he understood his rights and could not discuss the specifics of the case with police. He then began questioning the officers regarding their apprehension of him, finally engaging in a lengthy conversation during which he made incriminating statements. We held that Strayer waived his *Miranda* rights by his "own acts, words, and surrounding circumstances." 242 Kan. at 625. See also *State v. William*, 248 Kan. 389, Syl. ¶ 15, 807 P.2d 1292 (1991) (holding when a defendant initiates contact with the police after an assertion of a Sixth Amendment right to counsel, defendant waives that right and his or her statements are admissible).

When a trial court conducts a full hearing on the admissibility of an extrajudicial statement by an accused, determines the statement was freely, voluntarily, and intelligently given, and admits the statement into evidence at the trial, an appellate court accepts that determination if there is substantial competent evidence to support the trial court's determination. *State v. Johnson*, 253 Kan. 75, 83-84, 853 P.2d 34 (1993).

Prior to commencement of the interview, Hickles had been advised of his right to remain silent twice and had stated that he understood those rights. The record indicates that after stating he had nothing to say, Hickles immediately began questioning the agents. The entire interview with Hickles lasted only 15 to 30 minutes. When Hickles asked whether this was when he should get an attorney, the officer asked him several times whether he was requesting an attorney. Hickles said he was not. There is nothing

in the record to indicate that Hickles' age, intellect, and background affected the voluntariness of his statement, nor is there anything to indicate that the officers conducted the examination in an unfair manner. When the totality of the circumstances is considered, we find there was substantial competent evidence to support the trial court's finding of voluntariness and admissibility of Hickles' statement to police.

## FAILURE TO INSTRUCT

The trial court instructed the jury on the lesser included offenses of intentional second-degree murder, voluntary manslaughter, and involuntary manslaughter by the commission of a lawful act done in an unlawful manner. Hickles did not request an instruction on unintentional second-degree murder or reckless involuntary manslaughter.

Normally, our standard of review is that no party may assign as error the giving or failure to give an instruction unless he or she objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he or she objects and the grounds for the objection, unless the instruction is clearly erroneous. K.S.A. 22-3414(3). However, that rule does not apply here because the defendant in a criminal prosecution has a statutory right to have the court instruct the jury on all lesser included offenses established by substantial evidence. The question is not whether, in the mind of the court, the evidence as a whole excludes the idea that the defendant is guilty of a lesser degree of the offense charged, but whether there is any substantial evidence tending to prove a lesser degree of the offense. If there is, then the question of such degree should be submitted to the jury. *State v. Deavers*, 252 Kan. 149, 154-55, 843 P.2d 695 (1992), *cert. denied* 508 U.S. 978 (1993). There is some weighing of evidence in this analysis, but the weighing of evidence is not a retrial of the case. *State v. Dixon*, 252 Kan. 39, 43, 843 P.2d 182 (1992).

Hickles contends that the trial court erred in failing to instruct on the lesser included offenses of unintentional but reckless second-degree murder and reckless involuntary manslaughter.

Murder in the second degree is the killing of a human being committed unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life. K.S.A. 21-3402(b). Involuntary manslaughter is the unintentional killing of a human being committed recklessly. K.S.A. 21-3404(a). Criminal intent may be established by proof that the conduct of the accused person was intentional or reckless. Proof of intentional conduct shall be required to establish criminal intent, unless the statute defining the crime expressly provides that the prohibited act is criminal if done in a reckless manner. K.S.A. 21-3201(a). Intentional conduct is conduct that is purposeful and willful and not accidental. As used in the criminal code, the terms "knowing," "willful," "purposeful," and "on purpose" are included within the term "intentional." K.S.A. 21-3201(b). Reckless conduct is conduct done under circumstances that show a realization of the imminence of danger to the person of another and a conscious and unjustifiable disregard of that danger. The terms "gross negligence," "culpable negligence," "wanton negligence," and "wantonness" are included within the term "recklessness." K.S.A. 21-3201(c).

According to Hickles, the evidence warranting unintentional second-degree murder and reckless involuntary manslaughter instructions was his statement to Agent Williams that the stabbing "just happened" or that he "believed Earl got stabbed" as they fought for possession of the knife. Contrary to defendant's assertions, this evidence was not sufficient for the jury to infer that the killing was unintentional but reckless.

There was uncontroverted testimony that Hickles was angry at Whetstone, made several threats about killing him prior to the confrontation, and was seen thrusting his knife into Whetstone and then kicking the fallen victim in the chest and head. The forensic pathologist testified that there were 11 and possibly as many as 13 stab wounds. Witnesses testified that after Hickles stabbed the victim, he kicked him in the chest and then in the face. These actions are neither unintentional nor reckless. Therefore, there was no substantial evidence warranting jury instructions on unintentional but reckless second-degree murder and reckless involuntary manslaughter.

## ADMISSION OF PHOTOGRAPHS,
## JURY VIEW OF CRIME SCENE

Hickles first argues that several of the photographs introduced at trial were unduly prejudicial and fundamentally unfair because those pictures were gruesome and inflammatory and their prejudice outweighed any probative value. The admission of photographs in a homicide case is a matter within the trial court's discretion, and the court's ruling will not be disturbed on appeal absent a showing of abuse of discretion. *State v. Reed*, 256 Kan. 547, 557, 886 P.2d 854 (1994) (citing *State v. Stone*, 253 Kan. 105, 111, 853 P.2d 662 [1993]).

Except as otherwise provided by statute, all relevant evidence is admissible. K.S.A. 60-407(f). Even where the defendant concedes the cause of death, the prosecution has the burden to prove all the elements of the crime charged; and photographs to prove the elements of the crime, including the fact and manner of death and the violent nature of the crime, are relevant and admissible. *State v. Dargatz*, 228 Kan. 322, 329, 614 P.2d 430 (1980); *State v. Henson*, 221 Kan. 635, 647, 562 P.2d 51 (1977); *State v. Campbell*, 210 Kan. 265, 276, 500 P.2d 21 (1972). Photographs depicting the extent, nature, and number of wounds inflicted are generally relevant in a first-degree murder case. *State v. McCorgary*, 224 Kan. 677, 681, 585 P.2d 1024 (1978). Photographs are unduly prejudicial and are erroneously admitted when they are unduly repetitious, are particularly gruesome, and add nothing to the State's case. See *State v. Dargatz*, 228 Kan. at 329; *State v. Henson*, 221 Kan. at 646-47; *State v. Clark*, 218 Kan. 18, 24, 542 P.2d 291 (1975).

Hickles objected at trial to admission of numerous 3×5 photographs: Exhibits 10 C & D (depiction of paramedics as they attempted to revive Whetstone); autopsy pictures including Exhibit 26 A (picture of a wound to arm) and B (picture of two wounds to arm), Exhibits 22 and 23 (close up and perspective of wounds to face), 24 (bruising to inside of mouth), and 25 (broken larynx after removal from corpse); 30-38 (showing stab wounds to torso with four photographs depicting closeups of wounds with measuring tape to indicate the size of the wounds), Exhibit 47 (duplication of

some torso wounds), Exhibits 39-46 (wounds to extremities); Exhibit 28 (five pictures depicting walkway at crime scene showing droplets of blood); Exhibit 18 (six pictures of crime scene showing porch where body was found; Exhibit 9 (six pictures of crime scene showing front porch area); Exhibit 8 (pictures of crime scene including pictures of victim's bloody jeans); Exhibit 21 (six pictures showing blood drops at the Martinez residence); Exhibit 27 (three photographs showing blood droplets around the Martinez residence; Exhibit 16 (one picture of defendant's bedroom showing bloody jeans), and Exhibit 29 (two photographs showing blood droplets at defendant's residence). Hickles complains particularly about Exhibit 25, showing the larynx removed, and Exhibit 32, displaying the abdomen cut open with the liver exposed.

Hickles contends it was error to allow admission of 25 autopsy photographs to show the approximately 13 wounds. We have held that special care should be taken in admitting photographs taken after an autopsy in order that the evidence not be more gruesome than necessary. See *State v. Prouse*, 244 Kan. 292, Syl. ¶ 1, 767 P.2d 1308 (1989). "Gruesome" is defined in Webster's II New Riverside University Dictionary 552 (1988) as "[c]ausing horror and repugnance: shocking." In a crime of violence which results in death, photographs which serve to illustrate the nature and extent of the wounds inflicted are admissible when they corroborate the testimony of witnesses or are relevant to the testimony of a pathologist as to the cause of death, even though they may appear gruesome. *State v. Sutton*, 256 Kan. 913, Syl. ¶ 3, 889 P.2d 755 (1995).

Although some of the autopsy photographs admitted depict a particular wound more than once, this was generally done to show the wound both close up and from a perspective, to indicate the angle of the wound, and sometimes to show the entrance and exit position of the wound. Moreover, although the same wounds were depicted in more than one photograph, the State had a legitimate purpose for their introduction. The number of wounds and their character as offensive or defensive wounds were crucial to the State in proving first-degree murder since Hickles' defense was self-defense and that the stabbing "just happened." The close-up photo-

graphs assisted the pathologist's testimony in establishing the character of the wounds and showing that the wounds could reasonably have been caused by the defendant's knife. The perspective photographs allowed the jury to locate each wound on a readily identifiable portion of the deceased's body. Therefore, the autopsy photographs were not unduly repetitious. Although the autopsy photographs are not particularly pleasant, they are true reproductions of relevant physical facts and material conditions at the scene at issue. See *State v. Reed*, 256 Kan. at 557. The trial court did not err in admitting the autopsy photographs.

Exhibit 25 depicted the defendant's larynx after it had been removed from the body. As explained by the pathologist, Dr. Mitchell, the picture was taken "to demonstrate a break and the surrounding bruise of the tissues on the right, upper part of the back of the Adam's apple." Dr. Mitchell testified that the fracture was consistent "with being kicked in that area by somebody wearing shoes." Based upon this testimony, Exhibit 25 was relevant in assisting Dr. Mitchell in this testimony and also in corroborating Christine Whetstone's testimony that the defendant kicked her husband several times after the stabbing. This evidence was important to contradict defendant's claim of self-defense.

Exhibit 32 displaying the abdomen cut open corroborated the pathologist's testimony that this particular wound demonstrated the characteristic of the weapon used, "in that we have a blunt margin on this side and a sharp margin on the other indicating that the weapon used had one sharp side and one dull side." The pathologist also used this exhibit to demonstrate that the knife traveled a minimum of 3 to 4 inches into the deceased's body. Both statements by the pathologist contradicted Hickles' claim of self-defense and tied the knife found in Hickles' possession to the stabbing of Whetstone.

By their very existence, exhibits in a murder trial such as this are inevitably gruesome and unsettling. See *State v. Kingsley*, 252 Kan. 761, 770, 851 P.2d 370 (1993). After a careful examination of all the photographs, although many of the photographs were cumulative, none is particularly gruesome or unduly prejudicial; therefore, we cannot say that their admission into evidence brought

about the wrong result. The trial court did not err in admitting them into evidence.

Hickles next contends the trial court erred in admitting too many photographs. Here, over 100 photographs were shown to the jury. There are instances when the trial court may in the exercise of its discretion refuse to admit testimony which is cumulative. See *Thompson v. Norman*, 198 Kan. 436, 441, 424 P.2d 593 (1967). Cumulative evidence is evidence of the same kind to the same point, and whether it is cumulative is to be determined from its kind and character, rather than its effect. *Building Assn. v. McMullen*, 59 Kan. 493, Syl. ¶ 2, 53 Pac. 481 (1898). Cumulative evidence in itself is not objectionable. Error cannot be predicated on allowing the use of such evidence. *Smith v. Blakey, Administrator*, 213 Kan. 91, 97, 515 P.2d 1062 (1973).

Defendant also contends that the trial court erred in ordering the jury to view the crime scene. The State requested that the jury be ordered to view the crime scene so the jurors could obtain a general understanding of the layout of the house, the size of the porch, and the relationship of the porch to the house.

The decision to order a jury to view a crime scene is discretionary with the trial court. An appellate court will not reverse such a decision of the trial judge except for an abuse of discretion which affirmatively appears to have affected the substantial rights of the objecting party. *State v. McCorgary*, 218 Kan. 358, 364, 543 P.2d 952 (1975), *cert. denied*, 429 U.S. 867 (1976).

K.S.A. 22-3418 provides:

"Whenever in the opinion of the court it is proper for the jurors to have a view of the place in which any material fact occurred, it may order them to be conducted in a body under the charge of an officer to the place, which shall be shown to them by some person appointed by the court for that purpose. They may be accompanied by the defendant, his counsel and the prosecuting attorney. While the jurors are thus absent, no person other than the officer and the person appointed to show them the place shall speak to them on any subject connected with the trial. The officer or person appointed to show them the place shall speak to the jurors only to the extent necessary to conduct them to and identify the place or thing in question."

Defendant's primary argument that his rights were prejudiced by the jury's view of the crime scene is that the prosecutor argued

in closing argument that blood still could be observed on the wall of the porch at the time of the jury's visit. However, although photographs of the crime scene were introduced at trial, it cannot be said that a view of the physical surroundings at the crime scene did not further enlighten the jury. See *State v. McCorgary*, 218 Kan. at 364. Given the other testimony at trial and the introduction of the photographic evidence, the prosecutor's mention of blood did not affirmatively appear to have affected Hickles' substantial rights.

## HARD 40 SENTENCE

Review of a hard 40 sentence is sanctioned by K.S.A. 21-4627(c) and requires an appellate court to determine "whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports the findings that the aggravated circumstances existed and that any mitigating circumstances were insufficient to outweigh the aggravating circumstances." *State v. Gideon*, 257 Kan. 591, Syl. ¶ 16, 894 P.2d 850 (1995). Imposition of the hard 40 sentence may be upheld when an appellate court concludes that a rational factfinder could have found the existence of one aggravating circumstance beyond a reasonable doubt and any mitigating circumstances were insufficient to outweigh the aggravating circumstances. *State v. Reed*, 256 Kan. 547, Syl. ¶ 5, 886 P.2d 854 (1994).

At defendant's sentencing hearing, the prosecutor argued:

"There was testimony from Dr. Erik Mitchell indicating that Mr. Whetstone was stabbed at least 11 and probably 13 times, that he was kicked at least three times in the head and face, which evidence was corroborated by witnesses, specifically Sharon Patton and also the decedent's wife, Christine Whetstone, that he was kicked several times in the face. What is significant, Your Honor, is that there were no defensive wounds, no defensive wounds. It's the State's supposition that Mr. Whetstone didn't see the first blow from the knife. He didn't have a chance to defend himself, and once he was stabbed once, the defendant continued to stab him again, again, again and again and again, a total of at least 11 times, probably 13 times. Mr. Whetstone didn't have any marks on his hands indicating that he tried in any way to ward off these blows. He was staggered by the first stab. Mr. Hickles was not content with one stab wound. He had to do it at least 10 more times.

"The evidence also indicated, Your Honor, that he was kicked several times in the face. The force of one of those blows was sufficient to fracture his voice box, and after Mr. Whetstone was lying in a huge pool of his blood, after he'd been stabbed at least 11 times, after he had been kicked at least three or four times, O.J. Hickles walks up to him, grabs him by the face, pulls him up, looks him in the eyes and throws his head down."

Hickles' attorney asserted that any aggravating factor was outweighed by a mitigating factor, specifically that "[t]his particular incident erupted during a fight between two adults." The district court found that aggravating factor, K.S.A. 21-4636(f), was established by the evidence in that "[t]he defendant committed the crime in an especially heinous, atrocious or cruel manner."

Hickles contends on appeal that the evidence also established a mitigating factor namely that "[t]he victim was a participant in or consented to the defendant's conduct." K.S.A. 21-4626(3). Hickles argues that the mandatory language of K.S.A. 21-4626 required the trial court to consider this mitigating factor and that the trial court erred by holding that no mitigating factors had been established.

The record, however, reflects that the trial court followed the statutory mandate and considered the mitigating factor argued by defense counsel. The trial judge stated: "I do not find that there are any mitigating circumstances existing here which would offset the application of the Court's finding that Subsection (f) is applicable under 21-4636. . . . " Under the facts and circumstances of this case, the trial court's imposition of the hard 40 sentence was proper.

Affirmed.

ALLEGRUCCI, J., concurs in the result.