NOT DESIGNATED FOR PUBLICATION

No. 120,732

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DAVID DEAN HARRIS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; NANCY E. PARRISH, judge. Opinion filed May 22, 2020. Affirmed.

*Kasper Schirer*, of Kansas Appellate Defender Office, for appellant.

*Kurtis Wiard*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., POWELL and SCHROEDER, JJ.

PER CURIAM: At a house party in Topeka, Kansas, David Dean Harris drew his handgun on Deryl Copeland, which provoked Deryl to call 911. While on the phone with 911, Deryl followed Harris outside. Harris shot Deryl in the foot. A jury convicted Harris of one count of aggravated battery by knowingly causing great bodily harm to another person or disfigurement of another person. Harris now appeals his conviction, claiming several trial errors. After a thorough review of the record, we find no errors and affirm.

1

FACTUAL AND PROCEDURAL BACKGROUND

A grand jury indicted Harris on one count of aggravated battery by knowingly causing great bodily harm or disfigurement of another person. In November 2018, the district court conducted a 3-day jury trial at which 11 witnesses testified for the State and Harris testified on his own behalf. The following facts were established at trial.

In June 2017, Prince Braden and Chelsi Copeland, who were in a romantic relationship, were renting a house in Topeka. Deryl, Chelsi's father, lived at the home, as did Chelsi and Braden's young child. Deryl had his own bedroom. People often socialized in the home's attached garage where Braden made music.

On the evening of June 1, 2017, Chelsi and Braden invited friends over to their house to watch the first night of the NBA Finals. Chelsi invited Victoria Hennessee, and Braden invited his cousin, Harris. They were all well acquainted with each other, and it was known Harris regularly carried a gun. He had a gun on him that night. Various people came and went throughout the evening, and everyone consumed alcohol. After the game, Braden, Harris, and another guest spent most of their time in the garage smoking marijuana and listening to music.

Around 10:30 p.m., Deryl went to bed but awoke around 11:30 p.m. when he heard a commotion in the house. According to Deryl, upon waking he attempted to go to the bathroom across from his bedroom, but it was occupied so he went outside and urinated in the backyard. Deryl then reentered the house and headed back to his bedroom. Around the same time, Chelsi heard a door slam, so she went to the bathroom to see what was going on. Chelsi assumed it was her father who slammed the bathroom door because she heard the toilet running and believed that was the door that was slammed.

Chelsi confronted Deryl regarding the slammed the door. A verbal altercation ensued between Chelsi and Deryl and lasted about two minutes; neither could remember precisely what they argued about. Harris, Deryl, Chelsi, Braden, and Hennessee all testified the confrontation was only a verbal one and Deryl did not touch or threaten Chelsi. It was not normal for Deryl and Chelsi to get into arguments; in fact, Chelsi testified this was the first argument they had ever had. However, Deryl was both drunk and aggressive.

When the argument ended, Deryl returned to his room and slammed the door, believing the disagreement was over. Yet Chelsi told Braden what happened, and moments later Braden burst into Deryl's room, demanding he leave the house. Deryl testified he believed Braden was "sticking up for his girlfriend, [his] daughter. He wanted me to leave probably just to chill out for a while or something so things [would] blow over." Yet things began to escalate again. At some point during this altercation between Braden and Deryl, Braden pushed and shoved Deryl back into his bedroom. Standing in the hallway just outside of Deryl's bedroom was Harris with "a gun and a big old smile on his face, saying: 'Get the fuck out, get the fuck out.'" Braden, Chelsi, Deryl, and Hennessee all testified Harris drew his handgun and was holding it in his hand while demanding that Deryl leave.

Upset that Harris had drawn his gun, Deryl yelled at Harris, "Don't just show it, I mean use it. . . . Shoot me, mother fucker." Harris told Deryl he had five minutes to leave and was waiving the gun. Braden told Harris he had the situation under control and it was his house. When asked if he thought the use of a gun was necessary, Braden responded, "No. . . . I had probably with one hand pushed [Deryl] over, he was so drunk, he fell." Hennessee also testified she did not think the use of a gun was necessary. Deryl never touched Harris.

When Deryl got up off the floor, he used his cell phone to call 911 to report Harris had threatened him with a gun. Those around Deryl could hear him telling dispatch that Harris had threatened him with a firearm. Braden told Harris that Deryl was calling the police and told Harris to leave. Harris did not immediately leave but, shortly after being asked, elected to leave and went outside to his vehicle, which was parked on the street. Harris exited the house through the front door, gun in hand. Deryl did not know Harris' last name, so he followed Harris outside to get his license plate number to relay to the 911 operator so the police had a last name for "David." Braden testified he believed enough time had passed between Harris exiting the house and Deryl exiting the house for Harris to have left. Braden, Chelsi, Hennessee, and Deryl all testified that Deryl was holding only a cell phone and was unarmed. In fact, no firearms were kept in the residence, and Deryl had never owned a gun.

Once outside, Deryl walked toward the back of Harris' vehicle to get the license plate number. Harris testified Deryl followed him out of the house like "he was stalking prey or something." Harris stated Deryl approached within a few feet with his hand behind his back and he "didn't know what [Deryl] planned on doing, why he was approaching [] in a stalking manner, or . . . what tricks he had up his sleeve." Harris also testified, "I was under the impression he was trying to do me some harm. He rushed out of the house, and then like rushed behind me. I figured he was trying to get close enough to do something to me."

At that point, Harris fired two or three shots toward Deryl's feet. Harris testified he did not intend to hit Deryl—his only goal was to "pull out [his] protection and [shoot] towards the ground to back him up." The bullet from the second shot entered Deryl's right foot above his fourth toe, traveled through his foot, and exited through the bottom middle of his foot. Deryl fell to the ground and dropped his phone, screaming in pain. Harris immediately got in his car and drove away. Deryl testified he never threatened Harris in any way.

The State introduced the 911 call into evidence and played it for the jury, which corroborated Deryl's description of events immediately surrounding the shooting. In the call, Deryl stated someone threatened him with a gun. After he provided dispatch with the address, Deryl said the person who threatened him was "David something" and he was still at the house. Deryl then said, "I'll tell you what he's drivin', hold on . . . he pointed a gun at me . . . he's leavin' now." Immediately thereafter, wind can be heard blowing on the phone microphone followed by two or three loud banging noises, and then Deryl is heard screaming in the background.

Deryl remained on the ground until an ambulance arrived. He was hospitalized for three days and lost all feeling in his fourth toe. The treating orthopedic surgeon explained to the jury that the bullet fractured bones in Deryl's foot, and although he was able to close the entrance wound, the surgeon had to leave the exit wound open to allow drainage of residual fluid. Anesthesia was necessary to clean and close the wound, and the surgeon thought it qualified as a serious injury, but it was not immediately life threatening. Deryl was able to walk with a walking cast shortly after the accident.

Officers eventually found a revolver in the front yard of Braden and Chelsi's house near the road. There were no shell casings inside the revolver, and, based on the witnesses' description of the gun as a semiautomatic handgun, officers did not believe the revolver was used in the shooting. The gun Harris used to shoot Deryl was never recovered.

The day after the shooting, Harris contacted Chelsi and Braden through his girlfriend's Facebook account and demanded compensation for the revolver he lost in their front yard. When Braden refused to compensate him, Harris threatened Braden, telling him to "watch out, watch your back, watch your family." Chelsi was very angry and a little nervous about the threat made to her son, so she contacted detectives after receiving this threat.

A summary of Harris' testimony is helpful. On the evening of the party, he drove his girlfriend's car to the house where he had at least four shots of gin and three or four beers. He also smoked marijuana with Braden in the garage. Harris was carrying a semiautomatic handgun. He told the jury he regularly carried a firearm, especially in the summer when there tended to be more violence.

Harris admitted that while standing outside Deryl's bedroom he told Deryl he had to leave the house and his gun "left [his] pocket." Harris further admitted Deryl said to him, "Don't just show it, use it" and "Shoot me, mother fucker." He claimed Deryl tried to rush him, but Braden pushed him back. When describing Deryl's behavior, Harris never claimed he thought his life was threatened, instead saying Deryl tried to assault him.

When asked if he remembered Deryl calling the police, Harris responded, "I believe he might have been on the phone with the police when I was trying to leave. I had—I had not seen him because I was heading out the door, but I did hear him . . . talking about calling the cops." He also agreed that it was possible Braden told him to leave the residence.

Harris testified he walked out of the front door and closed it behind him. He claimed that once Deryl caught up to him, Deryl had his phone in his right hand and his other hand behind his back. Harris acknowledged he could hear Deryl talking on the phone to the police but claimed he was concerned because "he was approaching me in a stalking manner, or I had no idea what tricks he had up his sleeve."

Without saying anything to Deryl beforehand, Harris pulled out his gun and shot towards the ground to back Deryl up. When asked why he fired the shots, Harris said, "I was under the impression he was trying to do me some harm." He was also asked what he sought to accomplish by firing the shots, and Harris said, "It might have halted him. Or actually, it's possible he could have been drunk, it might've made him wake up and

6

realize what he was doing, something, pretty much to stop him from getting to me and doing whatever harm he thought he was going to do to me."

Harris testified that after he shot Deryl, he got in his car and left; he never reported he felt in fear of his life that night. He also denied that the revolver found in the front yard belonged to him and denied threatening Braden and his family.

During the jury instructions conference, the district court asked Harris' counsel if he was requesting a self-defense instruction, and he responded, "I'm not."

The jury found Harris guilty of aggravated battery by knowingly causing great bodily harm or disfigurement of another person. The district court sentenced Harris to 13 months' imprisonment and 12 months' postrelease supervision. Harris was also ordered to register as a violent offender for 15 years.

Harris timely appeals.

ANALYSIS

Harris makes five arguments on direct appeal. First, he argues the district court committed clear error by failing to give a self-defense jury instruction. Second, Harris argues the district court erred by allowing a detective's testimony because it served no purpose beyond bolstering the prior testimony of the State's witnesses. Third, Harris argues the State committed prosecutorial error by arguing his silence reflected negatively on his credibility. Fourth, Harris argues cumulative error deprived him of a fair trial. Fifth, Harris argues the district court erred when it ordered him to register as a violent offender.

7

I.    DID THE DISTRICT COURT COMMIT CLEAR ERROR BY FAILING TO INSTRUCT THE
      JURY ON SELF-DEFENSE?

Harris argues the district court committed clear error by failing to instruct the jury on self-defense. Specifically, he argues had the jury been instructed on self-defense it would have acquitted him and, therefore, the district court's failure to give a self-defense jury instruction was clear error. The State responds Harris invited any error and, if the error was not invited, such an instruction was not factually appropriate. The State also argues that if the district court's failure to give the jury instruction was an error, then any error was harmless.

When analyzing jury instruction issues, we follow a three-step process:

> "(1) determining whether the appellate court can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, *i.e.*, whether the error can be deemed harmless." *State v. Williams*, 295 Kan. 506, 510, 286 P.3d 195 (2012).

The "first and third step are interrelated in that whether a party has preserved a jury instruction issue will affect our reversibility inquiry at the third step." *State v. Bolze-Sann*, 302 Kan. 198, 209, 352 P.3d 511 (2015). "When a party fails to object to or request a jury instruction at trial, K.S.A. 22-3414(3) limits appellate review to a determination of whether the instruction was clearly erroneous." *State v. Knox*, 301 Kan. 671, 680, 347 P.3d 656 (2015); see K.S.A. 2019 Supp. 22-3414(3). "However, a defendant's ability to allege instructional error, even under K.S.A. 22-3414(3), is not absolute." *State v. Stewart*, 306 Kan. 237, 248, 393 P.3d 1031 (2017).

8

At the second step, when determining whether an error occurred, we "consider whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record." *Williams*, 295 Kan. 506, Syl. ¶ 4.

At the third step, when assessing whether the error requires reversal, "we will only reverse the district court if an error occurred and we are 'firmly convinced that the jury would have reached a different verdict had the instruction error not occurred.' *Knox*, 301 Kan. at 680 (quoting *Williams*, 295 Kan. 506, Syl. ¶ 5)." *State v. McLinn*, 307 Kan. 307, 318, 409 P.3d 1 (2018). As the party claiming clear error, Harris has the burden to demonstrate the necessary prejudice. See 307 Kan. at 318.

It is undisputed Harris did not request a self-defense jury instruction or object to the lack of such a jury instruction. Our review of the record indicates Harris did more than acquiesce in the district court's omission of the instruction—he specifically requested the instruction's omission. During the jury instructions conference, the following exchange took place between the district court and Harris' counsel:

> "[THE COURT]: Any other issues on the instructions? And then we'll want to go to the self-defense issue if you want to raise any issues with regard to that.
>
> "[THE DEFENSE]: Right. Well, I have nothing further related to the—
>
> "THE COURT: Proposed instructions?
>
> "[THE DEFENSE]: The proposed—your ruling regarding the inclusion of battery as a lesser.
>
> "THE COURT: And as far as self-defense you're not requesting any self-defense?
>
> "[THE DEFENSE]: I'm not.

9

"THE COURT: Okay. I don't know that we have any other issues.

"Any issues with any of the instructions, any of the other instructions to be proposed, or anything else that needs to be argued or reviewed?

"[THE STATE]: No, Your Honor.

"[THE DEFENSE]: No, Judge.

"THE COURT: Okay. That'll conclude the hearing."

Whether the invited error doctrine applies is a question of law subject to unlimited review. *State v. Fleming*, 308 Kan. 689, 695, 423 P.3d 506 (2018). Under the invited error doctrine, a litigant cannot invite error and then complain of that same error on appeal. *State v. Verser*, 299 Kan. 776, 784, 326 P.3d 1046 (2014). As the Kansas Supreme Court has elaborated:

> "'Where counsel for one party causes or invites a particular ruling, such party cannot later argue that such ruling was erroneous. [Citation omitted.] It is elementary that a litigant cannot take contrary positions, one in which he has sought and procured an order, ruling or judgment in the trial court and another in the supreme court in which he complains of such order, ruling or judgment. . . . One who by his own act invites and leads the court into erroneous action cannot complain of it nor take advantage of the ruling.' *Gilliland v. Kansas Soya Products Co.*, 189 Kan. 446, 451-52, 370 P.2d 78 [1962])." *State v. Sasser*, 305 Kan. 1231, 1235, 391 P.3d 698 (2017).

While a defendant does not invite error by acceding or acquiescing to the district court's proposed course of action, "when a defendant actively pursues what is later argued to be an error, then the doctrine most certainly applies." 305 Kan. at 1236.

In *Stewart*, defense counsel told the district court all the instructions the defense wanted were in the jury instruction packet. The Kansas Supreme Court concluded: "In

10

short, if there was any instructional error, the defense's unequivocal affirmative assertion that the instruction packet contained all the instructions Stewart wanted precludes this first-time-on-appeal argument that the jury instructions were clearly erroneous under K.S.A. 22-3414(3)." 306 Kan. at 250; see *State v. Collins*, No. 117,409, 2018 WL 5305661, at *12 (Kan. App. 2018) (unpublished opinion) (applying invited error doctrine to self-defense instruction), *rev. denied* 309 Kan. 1350 (2019); see also *State v. Angelo*, 287 Kan. 262, 280, 197 P.3d 337 (2008) (applying invited error doctrine when defendant asked district court not to give lesser included offense instruction).

The case at bar is like *Stewart*. Defense counsel's statements to the district court were not a simple acquiescence to what the district court or the prosecution had proposed. Instead, defense counsel made an "unequivocal affirmative assertion" that he did not want a self-defense jury instruction when the district court explicitly asked if he was requesting such an instruction. See 306 Kan. at 250. Harris cannot now complain on appeal that it was clearly erroneous for the district court to do precisely what he asked. Harris invited any error in the district court's decision not to instruct the jury on self-defense and, therefore, has not properly preserved the issue for our review.

Alternatively, even if we concluded Harris had not invited the alleged error he complains about, a self-defense instruction was not factually appropriate. Kansas law provides:

> "(a) A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person or a third person against such other's imminent use of unlawful force.

> "(b) A person is justified in the use of deadly force under circumstances described in subsection (a) if such person reasonably believes that such use of deadly

11

force is necessary to prevent imminent death or great bodily harm to such person or a third person." K.S.A. 2016 Supp. 21-5222.

Harris argues an instruction should have been given under K.S.A. 2016 Supp. 21-5222(a) because he fired his gun merely at Deryl's feet, not at his person, and such an action is simply a use of force, not deadly force. This argument is without merit. In *State v. Thomas*, No. 116,111, 2020 WL 1973954, at *8 (Kan. 2020), the Kansas Supreme Court explained the difference between "force" and "deadly force."

"K.S.A. 2019 Supp. 21-5222 distinguishes between 'use of force' and 'use of deadly force,' and K.S.A. 2019 Supp. 21-5221(a) provides their definitions. See K.S.A. 2019 Supp. 21-5221(a)(1)(B) ('"Use of force" means . . . the presentation or display of the means of force."); K.S.A. 2019 Supp. 21-5221(a)(2) ('"Use of deadly force' means the application of any physical force described in paragraph [1] which is likely to cause death or great bodily harm to a person."). These statutory definitions clarify that 'use of deadly force' does not include '[a]ny threat to cause death or great bodily harm, including, but not limited to, by the display or production of a weapon . . . [if] the actor's purpose is limited to creating an apprehension that the actor will, if necessary, use deadly force in defense of such actor or another.' K.S.A. 2019 Supp. 21-5221(a)(2).

". . . Compare *State v. Sanders*, No. 103,171, 2011 WL 3276191, at *5 (Kan. App. 2011) (unpublished opinion) (jury instruction appropriate on 'use of force' in self-defense when defendant pointed gun but did not fire), with *Hardy*, 305 Kan. 1001 (self-defense immunity for 'use of deadly force' when defendant fired gun). See 2 LaFave, Substantive Criminal Law § 10.4(a) (3d ed. 2018) ('But merely to threaten death or serious bodily harm, without any intention to carry out the threat, is not to use deadly force, so that one may be justified in pointing a gun at his attacker when he would not be justified in pulling the trigger.')."

Therefore, Harris' firing of his gun places it within the bounds of K.S.A. 2016 Supp. 21-5222(b). Here, the firing of his gun was the use of "deadly force" no matter at which part of Deryl's body he aimed.

To meet the definition of self-defense in K.S.A. 2016 Supp. 21-5222(b), Harris must have shown (1) he "'sincerely and honestly believed it was necessary to kill to defend [himself] or others" and (2) a "reasonable person in [his] circumstance would have perceived the use of deadly force in self-defense as necessary.'" See *State v. Macomber*, 309 Kan. 907, 916, 441 P.3d 479, *cert. denied* 140 S. Ct. 319 (2019).

K.S.A 2016 Supp. 21-5226 states:

"The justification described in . . . K.S.A. 21-5222 . . . is *not* available to a person who:

"(a) Is attempting to commit, committing or escaping from the commission of a forcible felony;

"(b) initially provokes the use of any force against such person or another, with intent to use such force as an excuse to inflict bodily harm upon the assailant; or

"(c) otherwise initially provokes the use of any force against such person or another, unless:

(1) Such person has reasonable grounds to believe that such person is in imminent danger of death or great bodily harm, and has exhausted every reasonable means to escape such danger other than the use of deadly force; or

(2) in good faith, such person withdraws from physical contact with the assailant and indicates clearly to the assailant that such person desires to withdraw and terminate the use of such force, but the assailant continues or resumes the use of such force." (Emphasis added.)

Harris correctly asserts he would have been entitled to a self-defense instruction even if the only evidence supporting his theory was his own testimony, which was contradicted by all other witnesses and physical evidence. See *State v. Qualls*, 309 Kan.

13

553, 557-58, 439 P.3d 301 (2019). However, even Harris' own testimony fails to support his self-defense claim. Harris' testimony shows he provoked Deryl, and it reflects neither a sincere and honest belief he thought it was necessary to shoot Deryl nor an objectively reasonable belief the use of deadly force was required.

First, Harris may not argue self-defense because he provoked Deryl. Harris testified that while he was standing outside Deryl's bedroom, he told Deryl to leave. Harris stood there with the gun in his hand and said, "Get the fuck out, get the fuck out." Harris conceded that his gun "left my pocket" and admitted that before removing the gun, he had it hanging out of his coat pocket. Stated differently, Harris exhibited the gun towards Deryl, and Harris himself testified Deryl told him, "Shoot me, mother fucker" and "Don't just show it, use it." Thus, Harris' own testimony shows he clearly provoked Deryl by displaying his gun. Such a provocation triggers K.S.A. 2016 Supp. 21-5226(c). See *State v. Beltz*, 305 Kan. 773, 781-82, 388 P.3d 93 (2017) (explaining K.S.A. 2016 Supp. 21-5226(c) does not contain the "additional element that the initial provocation be done 'with intent to use such force as an excuse to inflict bodily harm upon the assailant'").

Such a conclusion that Harris was the initial aggressor, triggering the application of K.S.A. 2016 Supp. 21-5226(c), is supported by *State v. Collins*, No. 117,743, 2020 WL 1973957 (Kan. 2020). In that case, the Kansas Supreme Court held: "The district court took too narrow of a view of the initial aggressor statute when it concluded Collins did not provoke 'physical force.'" 2020 WL 1973957, at *8. The court held that a reasonable person could conclude Collins' derogatory verbal comments towards the victims provoked the victims' use of force against him. Collins then responded with his own use of force—halting the retreat to his apartment at the top of the stairwell, turning to the women, and brandishing the knife. 2020 WL 1973957, at *8.

14

Here, Deryl and Chelsi's altercation had ended, and Deryl remained in his bedroom when Braden and Harris reengaged the altercation. At that point, Harris demanded Deryl leave Deryl's own home and brandished his firearm. Like in *Collins*, "[t]his must be analyzed first under the initial aggressor provision of K.S.A. 2019 Supp. 21-5226(b) and (c). Importantly, at this point, we are not concerned with what happened" after Harris brandished the gun. See 2020 WL 1973957, at *8.

Under K.S.A. 2016 Supp. 21-5226(b),

"use of force is not justified if the person initially provokes the use of force against that person or another, with intent to use the force as an excuse to inflict bodily harm on the assailant. . . .

But under subsection (c)'s retreat safe harbor exceptions, a provocateur's use of force can be justified in only two circumstances. First, under subsection (c)(1), if they have reasonable grounds to believe they are in imminent danger of death or great bodily harm and have exhausted every reasonable means to escape such danger other than resorting to the use of deadly force. Second, under subsection (c)(2), if in good faith they withdraw from physical contact with the assailant *and* clearly indicate their desire to withdraw and terminate the use of force, but the assailant continues or resumes it." 2020 WL 1973957, at *8.

At the moment Harris brandished his firearm, there is no testimony he attempted to escape. Rather, he continued with the conflict and did not immediately leave the residence. Further, Harris testified he could not drive away when Deryl exited the home on the phone with the police because he was on the passenger's side of the vehicle. Yet, testimony at trial indicated he immediately fled from the shooting in the passenger's side of the vehicle, which indicates that escape in the vehicle was a possibility. Harris also failed to explain how he "exhausted every reasonable means to escape such danger other than" using deadly force. See K.S.A. 2016 Supp. 21-5226(c)(1).

15

Harris' claim also does not satisfy the exception of K.S.A. 2016 Supp. 21-5226(c)(2). First, Harris' own testimony revealed Deryl never touched him, meaning there was no "physical contact" to retreat from. Second, Harris never communicated to Deryl that he had a desire to withdraw—as the recording of the 911 call and the testimony at trial indicate, Harris did not speak a word to Deryl when he exited the house before Harris fired his firearm at Deryl. As a result, Harris' provocation precludes his claim of self-defense. See *State v. Jackson*, 262 Kan. 119, 123, 936 P.2d 761 (1997) ("Here, it was uncontroverted that Jackson was the initial aggressor. The facts indicated that Jackson was told to leave the club more than once. After [the victim] placed his hand on Jackson and asked Jackson to leave the club, Jackson struck and then shot the unarmed [victim]."); *State v. Schroeder*, 103 Kan. 770, 772-73, 176 P. 659 (1918) ("Self-defense is a defensive act and not an offensive one, and one who brings on a conflict is not acting defensively, but is acting unlawfully, and he cannot escape the consequences of his wrong upon the plea of self-defense or apparent danger.").

K.S.A. 2016 Supp. 21-5226(c)'s application aside, Harris' testimony about what transpired after he provoked Deryl fails to establish both a subjectively and objectively reasonable belief Harris was in danger of imminent death or great bodily harm. Harris admitted he could hear Deryl talking on the phone to the 911 operator while Deryl was walking behind him. He characterized Deryl's gait as "a stalking manner" that made Harris wonder "what tricks he had up his sleeve." But vague references to "tricks" and "some harm" do not establish Harris' life was at risk or he was about to suffer great bodily harm.

Harris' explanation of his state of mind further supports such a conclusion. Harris testified it was possible the shots from his gun would have snapped Deryl from his drunken state so he would realize what he was doing. Harris' statement does not reflect the state of mind of someone who genuinely believes his life is in danger and is seeking to protect it. This fits with the other facts to which Harris testified:  (1) Harris never

16

bothered to say anything to Deryl before he fired shots; (2) Harris heard Deryl speaking on the phone to the 911 operator; (3) Harris had never seen Deryl with a gun; and (4) after shooting Deryl, Harris got in a car and drove away rather than tell the police Deryl was going to attack him. Such testimony leads to the conclusion Harris did not believe his life was in danger—he was worried Deryl was going to report him to the police.

Further, Harris cannot establish he had an objectively reasonable belief that death or great bodily harm was imminent for many of the same reasons. Principally, no reasonable person who hears the alleged assailant announce he was calling the police and then hears the alleged assailant speaking on the phone to a 911 operator would think such person would attack while on the phone with 911. This is especially true when the person claiming self-defense has never seen the alleged assailant with a gun. Harris' claim of self-defense is not objectively reasonable nor is it subjectively reasonable as previously discussed. As such, a self-defense jury instruction was not factually appropriate, and Harris cannot carry his burden of establishing clear error.

II.     DID THE DISTRICT COURT ABUSE ITS DISCRETION IN ADMITTING ALLEGEDLY CUMULATIVE TESTIMONY?

Harris next argues the district court erred in admitting the testimony of Topeka Police Department Detective Matt McClimans because it was cumulative. He argues the testimony served no purpose but to unfairly prejudice him by reminding the jury of the evidence against him and bolstering the other witnesses' credibility. The State responds that McClimans testified about more than what other witnesses told him. The State also argues that because it carries a heavy burden to prove a defendant guilty beyond a reasonable doubt, it must be able to present evidence of the investigation that led to the defendant's prosecution.

We review "a question of whether evidence is cumulative for an abuse of discretion." *State v. Rodriguez*, 295 Kan. 1146, 1156, 289 P.3d 85 (2012). A judicial action constitutes an abuse of discretion if it "is arbitrary, fanciful, or unreasonable; is based on an error of law; or is based on an error of fact." *State v. Ingham*, 308 Kan. 1466, 1469, 430 P.3d 931 (2018).

Cumulative evidence is evidence that is "unduly repetitious." See *State v. Green*, 274 Kan. 145, 147, 48 P.3d 1276 (2002). Stated differently, "[c]umulative evidence is evidence of the same kind to the same point, and whether it is cumulative is to be determined from its kind and character, rather than its effect." *State v. Hickles*, 261 Kan. 74, 88, 929 P.2d 141 (1996). "[A]lthough '[t]here are instances when the trial court may in the exercise of its discretion refuse to admit testimony which is cumulative,' cumulative evidence is not itself objectionable. *Hickles*, 261 Kan. at 88." *State v. Miller*, 284 Kan. 682, 699, 163 P.3d 267 (2007).

At trial, the State called McClimans to testify. Prior to McClimans' testimony, a Topeka police officer told the jury, "A uniformed patrol officer's response is to the initial 911 call, try to ascertain basic information about victim, suspect, that kind of thing. Criminal Investigations Bureau comes in and does more thorough interviews with all the parties." That officer testified he was mostly concerned with gathering initial information, not investigating what occurred before the shooting.

At the beginning of McClimans' testimony, defense counsel objected to his testimony as cumulative, asserting the only purpose of the testimony was to bolster Deryl's credibility. The State responded that as the detective who conducted the investigation, he was being called to inform the jury what steps he took in investigating the shooting, as well as what information led to the identification of Harris. The district court overruled the objection, holding the information was not cumulative so long as McClimans did not simply repeat what Deryl told him. The defense again objected later

18

during McClimans' testimony, arguing the testimony was cumulative, but the district court overruled the objection again.

A summary of McClimans' testimony shows his testimony went beyond the testimony of the other witnesses:

- He related it was not obvious Deryl had been drinking that night, observing "he was able to articulate himself okay."

- Deryl gave him a physical description matching Harris so officers could search for him.

- He spoke of his observations of Chelsi, noting she was very upset, frantic, and scared. Although she initially refused to tell him who shot Deryl, she later cooperated.

- He explained officers eventually located Harris by running a license plate check based on information provided by Harris' mother.

- He talked about other individuals he had attempted to interview but was eventually unsuccessful in contacting.

- He described State's Exhibit 6 to the jury, which was a photograph of Deryl's bloody shoe and explained why the shoe was consistent with Deryl's injury.

- He testified about his search of the crime scene. A rusty Smith & Wesson .38 caliber revolver was found in the yard; there were no shell casings in the gun.

Since he did not think the revolver was used in the shooting, he ran no tests on the gun other than a serial-number check, which returned nothing.

- He ultimately told the jury he was unable to find a gun that matched the description of the one used in the shooting.

McClimans did not just repeat the testimony of the other witnesses. He gave the jury additional insights into what occurred in the investigation and the investigation's depth.

Harris argues McClimans' testimony was a veiled attempt by the State to bolster the credibility of its witnesses. But this argument goes to the effect of the evidence, and the Kansas Supreme Court has long held that whether evidence is cumulative is dependent on its "'kind and character, rather than its effect.'" *State v. Dupree*, 304 Kan. 43, 65, 371 P.3d 862 (2016); see *Winfield Building & Loan Association v. McMullen*, 59 Kan. 493, Syl. ¶ 2, 53 P. 481 (1898). The kind and character of McClimans' testimony was not cumulative; he was the only detective to testify at trial and the only witness who discussed the State's investigation of the crime. The defense was able to thoroughly cross-examine all witnesses, including McClimans. "When two witnesses for the prosecution give cumulative testimony on the same subject to impeach the defendant's testimony, and the testimony of both witnesses is relevant, no error results, for the admission of cumulative evidence, if relevant, rests in the judicial discretion of the trial court." *State v. Johnson*, 231 Kan. 151, 156-57, 643 P.2d 146 (1982); see *State v. Kackley*, 32 Kan. App. 2d 927, 935, 92 P.3d 1128, *rev. denied* September 14, 2004. McClimans' testimony was not cumulative; therefore, the district court did not abuse its discretion in admitting this evidence.

Finally, even if we assume McClimans' testimony to be cumulative, any error was harmless. Unless the erroneous admission of evidence implicates a constitutional right,

20

we review the erroneous admission of evidence under the harmless error standard in K.S.A. 2019 Supp. 60-261. See *State v. Longstaff*, 296 Kan. 884, 895, 299 P.3d 268 (2013). K.S.A. 2019 Supp. 60-261 provides: "At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." The party who benefits from the error—here, the State—"has the burden to demonstrate harmlessness." *State v. Anderson*, 308 Kan. 1251, 1259, 427 P.3d 847 (2018).

Harris argues we should construe this evidentiary issue as a constitutional one, but the Kansas Supreme Court has held that when the issue relates to the application of a rule of evidence and not a complete denial of a defense, the harmless error standards of K.S.A. 60-2105 and K.S.A. 60-261 apply rather than the constitutional standard. *State v. Gilliland*, 294 Kan. 519, 542, 276 P.3d 165 (2012); see *Hickles*, 261 Kan. at 88-89 (admissibility of cumulative evidence addressed as evidentiary question).

Given the weight of the testimony against Harris and his ability to thoroughly cross-examine the State's witnesses, any error resulting from McClimans testifying similarly as other witnesses was harmless.

III.    DID THE STATE COMMIT PROSECUTORIAL ERROR BY ARGUING HARRIS' SILENCE REFLECTED NEGATIVELY ON HIS CREDIBILITY?

Harris argues the State committed prosecutorial error by claiming Harris' silence reflected negatively on his credibility. Specifically, he argues the State violated his constitutionally protected right to remain silent, known as a *Doyle* violation, when the State claimed in its closing that Harris was not credible because he never shared his version of events with law enforcement before trial. See *Doyle v. Ohio*, 426 U.S. 610, 618-19, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). The State makes four arguments in response: (1) Harris did not preserve his *Doyle* challenge; (2) Harris improperly raises this argument for the first time on appeal; (3) if the issue is properly preserved, the

21

prosecutor commented on Harris' pre-*Miranda* silence, so there is no *Doyle* violation; and (4) even if there is a *Doyle* violation, any prosecutorial error is harmless.

During her closing argument the prosecutor stated:

"And what do [Harris'] actions show after he shot, what does he do? He gets in his car and he leaves. Now, the defendant told you on the stand that he knew Deryl was calling 911, or that's what he assumed. So if he's calling 911, officers would likely be on their way. So why doesn't he stay? Instead he leaves. And did he tell you that when he left, he called 911? No. When he left, did he go immediately to the police station and say that he felt threatened by Deryl? No. *The defendant told you he never told police officers what he told you yesterday, so what makes sense here*?" (Emphasis added.)

Harris' counsel did not object.

During the State's cross-examination of Harris, the following exchange occurred:

"THE STATE:  Where did you go after you left Chelsi's house?

"HARRIS:  I went to my house.

"THE STATE:  And did you ever call 911 that night?

"HARRIS:  No.

"THE STATE:  Did you ever call the police that night to report that Deryl had came [*sic*] at you in a stalking manner?

"HARRIS:  No.

"THE STATE:  Did you ever report that you felt in fear of your life from Deryl that night?

22

"HARRIS:       No."

Harris' counsel also did not object to this line of questioning.

We use a two-step process to evaluate claims of prosecutorial error:  error and prejudice.

> "To determine whether prosecutorial error has occurred, the appellate court must decide
> whether the prosecutorial acts complained of fall outside the wide latitude afforded
> prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that
> does not offend the defendant's constitutional right to a fair trial. If error is found, the
> appellate court must next determine whether the error prejudiced the defendant's due
> process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional
> constitutional harmlessness inquiry demanded by *Chapman* [v. California, 386 U.S. 18,
> 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if
> the State can demonstrate 'beyond a reasonable doubt that the error complained of will
> not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there
> is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]"
> *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

In a case where a defendant argues his constitutional rights—such as those protected by *Doyle*—were violated, we review the claim de novo. *State v. Fisher*, 304 Kan. 242, 248, 373 P.3d 781 (2016). A *Doyle* violation does not automatically necessitate the reversal of a conviction. 304 Kan. at 249. Rather, we must then decide

> "whether the error was harmless by examining it in the context of the record as a whole,
> and by considering how the district court judge dealt with the error when it arose.
>
>    '[T]he error may be declared harmless where the party benefitting from the error
> proves beyond a reasonable doubt that the error complained of . . . did not affect the
> outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable
> possibility that the error contributed to the verdict.' [Citations omitted.]" 304 Kan. at 248.

23

Generally, the State is not allowed to impeach a defendant using the defendant's post-*Miranda* silence. *Doyle*, 426 U.S. at 619; *Fisher*, 304 Kan. at 248. Yet there are some notable exceptions to this rule. Under one such exception, a defendant's silence before *Miranda* warnings are given and a defendant's statements made after the warnings are given are not protected under *Doyle*. *Fisher*, 304 Kan. at 249. If the *Doyle* challenge concerns an evidentiary issue raised at trial—e.g., a prosecutor's line of questioning on direct or cross-examination—a defendant cannot argue the issue on appeal if the defendant did not timely and specifically object to it during the trial. See K.S.A. 60-404; *State v. King*, 288 Kan. 333, 348-49, 204 P.3d 585 (2009). However, if the defendant alleges the *Doyle* violation occurred during a prosecutor's opening or closing remarks, an appellate court may consider the alleged violation for the first time on appeal even when there is no objection. See *King*, 288 Kan. at 349.

Here, Harris complains of the prosecutor's following statement on closing argument: "The defendant told you he never told police officers what he told you yesterday, so what makes sense here?" Harris tries to frame this statement as a nonevidentiary statement to avoid K.S.A. 60-404's mandate that he have objected to this statement in order to preserve the issue for appeal. Accepting this premise as true for the sake of analysis, we are still unpersuaded by Harris' argument.

As previously noted, the use of a defendant's prearrest silence to impeach the defendant's credibility does not violate his or her constitutional rights. See *Jenkins v. Anderson*, 447 U.S. 231, 238-39, 100 S. Ct. 2124, 65 L. Ed. 2d 86 (1980); *State v. Hernandez*, 284 Kan. 74, 82-83, 159 P.3d 950 (2007). "A defendant's silence before given *Miranda* warnings and his or her statements after given the warnings are fair game." *Fisher*, 304 Kan. at 249. Stated differently, it is a defendant's *Miranda* warning that triggers the rule in *Doyle*. Consequently, the record before us does not support a *Doyle* violation.

Harris claims the prosecutor's statement during closing argument —"The defendant never told police officers what he told you yesterday"—means Harris never told police officers anything either on the night of the incident or in the months after the shooting leading up to trial. But we "do not isolate the challenged comments; [we] consider them in the context they were made." *State v. Butler*, 307 Kan. 832, 865, 416 P.3d 116 (2018). In closing, the prosecutor asked: "*The defendant told* you he never told police officers what he told you yesterday, so what makes sense here?" (Emphasis added.) In light of the questions asked of Harris, it is clear the prosecutor was referring to the events immediately after the shooting. During cross-examination, the prosecutor asked Harris, "And did you ever call 911 *that night*?" "Did you ever call the police *that night* to report that Deryl had came [*sic*] at you in a stalking manner?" "Did you ever report that you felt in fear of your life from Deryl *that night*?" (Emphases added.) Clearly then, at closing, the prosecutor was bringing home the point that Harris never told police on the night of the shooting—before Harris' *Miranda* warning—what he said on the stand. As such, there was no *Doyle* violation here and no prosecutorial error.

Even if we assume a *Doyle* violation occurred, any such violation is harmless because there is no reasonable possibility the error contributed to the verdict. See *Fisher*, 304 Kan. at 248. The prosecutor's three questions during cross-examination and sole comment in closing argument could not have affected the verdict when the jury could glean from the other evidence present at trial that Harris did not come forward with his self-defense theory on the night of the shooting. After Harris shot Deryl, he got in a car and drove away. McClimans testified that after interviewing the witnesses, he issued an attempt to locate, but officers were unable to find Harris that night. He later arrested Harris for aggravated battery. Further, Harris testified he did not inform police on the night of the shooting that he felt threatened or in fear for his life. Simply put, the jury knew from independent evidence—not from the single statement in closing argument— Harris did not tell officers that night that he shot Deryl in self-defense. "The jurors had the opportunity to see the key players testify under oath about what happened and to

25

gauge their responses to cross-examination about their respective versions." *State v. Jenkins*, No. 117,026, 2018 WL 2375788, at \*12 (Kan. App. 2018) (unpublished opinion), *rev. denied* 309 Kan. 1351 (2019). After assessing the credibility of the witnesses, the jurors returned a guilty verdict. In light of all the other evidence, the one statement from the State in closing had slight weight on the verdict.

There was no prosecutorial error.

## IV.    DID CUMULATIVE ERROR DEPRIVE HARRIS OF A FAIR TRIAL?

Next, Harris argues that cumulative error deprived him of a fair trial. Specifically, he argues that, combined, the jury's inability to consider that Harris acted in self-defense, the cumulative evidence, and the improper use of Harris' silence to attack his credibility denied him a fair trial.

But we will not find cumulative error when the record fails to support the errors a defendant raises on appeal. See *State v. Marshall*, 303 Kan. 438, 451, 362 P.3d 587 (2015). Because our review has concluded Harris' trial issues on appeal to be meritless, there was no cumulative error.

We affirm Harris' conviction.

## V.    DID THE DISTRICT COURT ERR IN REQUIRING HARRIS TO REGISTER AS A VIOLENT OFFENDER?

Finally, Harris argues the district court erred when it ordered him to register as a violent offender. Specifically, he argues the district court was required to make a finding from the bench that Harris used a deadly weapon in the commission of his crime. The State responds that such a finding made on the journal entry of judgment is sufficient.

26

Whether a defendant is a violent offender pursuant to the Kansas Offender Registration Act (KORA), K.S.A. 2019 Supp. 22-4901 et seq., turns on interpretation of K.S.A. 2019 Supp. 22-4902(e)(2), which is a question of law subject to unlimited review. *State v. Marinelli*, 307 Kan. 768, 788, 415 P.3d 405 (2018).

"KORA requires individuals convicted of certain crimes to register with the State. One category of individuals required to register are 'violent offenders.' KORA provides multiple ways in which a person may qualify as a 'violent offender' and thus be subject to the Act's registration requirement." *State v. Carter*, 311 Kan. 206, 209, 459 P.3d 186, 189 (2020). K.S.A. 2019 Supp. 22-4902(e)(2) defines one category of "violent offenders" as a person who "on or after July 1, 2006, is convicted of any person felony and the court makes a finding on the record that a *deadly weapon was used in the commission* of such person felony." (Emphasis added.)

The Kansas Supreme Court has recently made it clear that "a district judge must make a finding on the record before a KORA obligation to register as a violent offender arises. see *Marinelli*, 307 Kan. at 784; *Thomas*, 307 Kan. at 748-49." *Carter*, 311 Kan. at 209, 459 P.3d at 189.

In *Carter*,

"the district judge made an oral finding on the record [at sentencing] that there 'was a dangerous weapon involved' in Carter's crime. This language differed from that required by the statute, but the judge's journal entry included a checked box stating that he found Carter used a *deadly* weapon *in the commission of* her crime. . . .

"Although Carter might have asserted that a sentence pronounced from the bench typically controls over a differing journal entry, see *Abasolo v. State*, 284 Kan. 299, Syl. ¶ 3, 160 P.3d 471 (2007), that rule is not applicable here because . . . registration is not part of a defendant's sentence.

"In the absence of any other argument . . . , we hold that the journal entry included in the record of this case shows the district judge made the necessary finding under K.S.A. 2019 Supp. 22-4902(e)(2)." 311 Kan. at 210-11, 459 P.3d at 190.

In light of this authority, we hold there was a sufficient finding made on the record that Harris used a deadly weapon in the commission of his crime. On the journal entry of judgment the district judge affirmatively checked the box that asks: "Did offender, as determined by the court, commit the current crime with a deadly weapon?" An iteration of this finding was made in two other places on the journal entry of judgment—"Any person felony with court finding on the record that such felony was committed with a DEADLY WEAPON" and "Any conviction of a person w/ court finding on the record that such felony was committed with a DEADLY WEAPON." (Emphasis in original.) Additionally, although the district court did not use the precise language of K.S.A. 2019 Supp. 22-4902(e)(2), it did inform Harris he was required to register as a violent offender for 15 years.

Because the journal entry of judgment included in the record shows the district judge made the necessary finding under K.S.A. 2019 Supp. 22-4902(e)(2), the district court did not err in requiring Harris to register as a violent offender under KORA.

Affirmed.